BROWNING, J.
A jury found Terrance Washington guilty of the charged offenses of first-degree murder (Count One) and aggravated child abuse (Count Two). The criminal acts were inflicted upon a 11-month-old male victim, A.H., who sustained extensive internal and external injuries on December 4, 1996, and died the next day despite extraordinary medical efforts to save him. The trial court adjudicated Washington guilty and sentenced him to life, with no possibility of parole, in Count One, and to a concurrent sentence of 15 years in Count Two. As grounds for reversal, Washington contends 1) that the evidence was insufficient to prove first-degree murder, second-degree murder, or aggravated child abuse; 2) that the trial court erred by unduly limiting defense counsel’s cross-examination of the victim’s mother, Nafeesa Howard (“Howard”), who, along with Washington, was the only custodian of the victim during the period when the injuries could have occurred; 3) that the lower tribunal erred in excluding evidence of Howard’s physical and verbal abuse of her baby, the victim, in the weeks preceding his death; and 4) that it was error to death-qualify the jury in a case in which the State improperly sought the death penalty. Concluding that the trial court reversibly erred by unreasonably restricting the cross-examination of Howard and by excluding evidence relevant to that key witness’ motive and credibility, we reverse Washington’s conviction and remand for a new trial.

Motion for Judgment of Acquittal

As his first point, Washington argues that because the evidence was insufficient to prove first-degree murder, second-degree murder, and aggravated child abuse, the trial court erred in denying his motion for judgment of acquittal. The Supreme Court of Florida has characterized, as follows, the posture of a case when a defendant moves for judgment of acquittal:
A defendant, in moving for a judgment of acquittal, admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence. The courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law. Where there is room for a difference of opinion between reasonable men as to the proof or facts from which an ultimate fact is sought to be established, or where there is room for such differences as to the inferences which might be drawn from conceded facts, the Court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail and not primarily the views of the judge. The credibility and probative force of conflicting testimony should not be determined on a motion for judgment of acquittal.
Lynch v. State, 293 So.2d 44, 45 (Fla.1974).
Washington’s own statements to the police, made in an interview on the day after the victim was taken to Tallahassee Memorial Hospital, indicated that 16-year-old Washington and 19-year-old Howard were the only two individuals who were with the victim and his 2-month-old brother during the period when the injuries were inflicted.[1] In essence, the trial became a contest over whether the victim sustained his injuries while in Washington’s sole custody and care; if not, then Howard was the only other reasonably possible suspect.
The State’s witness Karen L. Marsh, a detective with the Leon County Sheriffs *1212 Office, testified that Washington had given a taped statement on December 5, 1996, at the sheriffs office. Washington told Marsh that on the date of the injuries, he had taken A.H. to the playground around 9:40 or 10:00 A.M. and remained with the child there for 30-45 minutes. He helped A.H. climb to the top of the sliding board, and he rode down the slide with the child the first time. During the second effort, he helped A.H. halfway up the steps, and the child rode down by himself. On the third attempt, A.H. climbed the steps by himself and fell from the second or third rung as Washington waited to catch him in front of the slide. Washington said that after falling to the ground, A.H. had cried a little bit but did not seem to be seriously hurt. Washington picked him up and walked over to make a call on a pay telephone. When Washington and A.H. returned to Howard’s apartment (where Washington stayed intermittently), Howard and the other infant were there. Washington immediately informed Howard that A.H. had fallen from a slide. Washington told authorities that he then wiped sand off A.H. and cleaned the child’s ears with a cold, wet washrag. Subsequently, he gave A.H. a bottle and laid him down. A.H. slept for about 10 minutes while Washington and Howard watched a movie. When A.H. woke up, he was given some more milk and was put back to bed.
Washington reported that subsequently, he and Howard heard funny noises, and she went first into the bedroom and then called Washington to come there. A.H. appeared to be having some kind of seizure; he was vomiting through his mouth and nose. His feet and hands were turning in. Howard told Washington to get a fork, which he used to prevent A.H. from choking on his tongue. Washington and Howard decided to take the child to the hospital emergency room.
Marsh testified that Washington told her that Howard had not shaken A.H. in Washington’s presence. Washington did not indicate to Marsh that Howard was alone with A.H. anytime during the period in question except when Howard went into the bedroom after hearing noises. Marsh never asked Washington how much time elapsed between his return from the playground and the discovery that the child was in physical distress.
Detective Curtis Parker testified that he had assisted Detective Marsh in the initial, pre-arrest taped interview of Washington and had helped Sergeant Mike Wood conduct a follow-up, post-arrest untaped interview. Parker indicated that Washington had heard and understood his Miranda[2] rights, which he agreed to waive. The substance of the second interview was fairly consistent with the first, and Washington gave no confession to killing the baby.
Testifying for the State, Howard said that in December 1996, she lived with A.H. and Terrance, Jr., at the Briarwood Manor Apartments. On December 4, the babies had slept in the bed while Washington slept on the sofa. On that morning, A.H. did not seem fussy, and he had no trouble walking around. Howard said that around 10:00 or 10:30 A.M., Washington told Howard that he was taking A.H. to the playground behind the apartment complex. When Washington returned with the child 15-20 minutes later, A.H. was awake in Washington’s arms. The child’s hand was on his ear, which was a sign that he was sleepy. Washington was acting perfectly normal and did not seem upset or angry. He told Howard that A.H. had fallen off a sliding board and had vomited. Howard testified that the baby was neither dirty nor sandy, and that neither she nor Washington had washed sand off the child.
Howard testified that A.H. had a hickey or scratch mark on his head but was not crying or complaining when he returned with Washington from the playground. Howard said that she had not undressed A.H. or checked on him. When Howard left the apartment to purchase Gatorade for A.H. and to get breakfast for Washington, she left the two babies alone with him. *1213 When Howard returned to the apartment 30-45 minutes later, she started to fix a bottle for A.H., but Washington said this was unnecessary because A.H. already had drunk it. Howard testified that before sitting down to watch a rented movie, she went to check on A.H. and discovered that he was breathing funny and was twisting his hands outwardly. As A.H. appeared to be sleeping uncomfortably, Howard put him back in place. After the child turned out his hands again, Howard picked him up on both sides and called his name. A.H. seemed to have no control over his limbs. Howard denied violently shaking A.H., slapping his face, punching or hitting him, or otherwise hurting him during that time. Howard said that upon observing the child’s distress, she called Washington to the room and told him that something was wrong with A.H. She asked Washington to hold the child’s tongue. Howard did not observe any bruises on A.H., who was wearing a shirt and Pampers. Howard testified that she did not see Washington shake, strike, or otherwise hurt A.H. on December 4,1996.
At the hospital, Howard told Dr. Thomas Truman that she had taken A.H. to the playground, where he fell off a sliding board. Howard also told the physician that she had been the only person with A.H. since 5:00 A.M. Howard testified that she had lied to the doctor because Washington had a warrant for his arrest,, and she did not want to see him go to jail. Wfiien she arrived at the emergency room, Howard did not think Washington had done anything wrong to the child, and she wanted to protect him. After the medical authorities told Howard that AH.’s injuries were not consistent with a fall from a sliding board, she confronted Washington and asked what he had done to her baby. Washington reported that A.H. had fallen from the second step from the top of the slide.
The primary treating physician, Dr. Truman, a board-certified pediatric intensive-care physician, testified that he was asked by an emergency-room physician to assist in caring for A.H. shortly after the critically ill child’s 12:30 P.M. check-in on December 4, 1996. Truman characterized the 11-month-old victim as neurologically very abnormal and nearly comatose, with what appeared to be bruises over several aspects of his body. The baby had difficulty breathing. Despite a very aggressive resuscitation effort, the victim evolved from essentially comatose to brain-dead, and life support was withdrawn on December 5.
Aside from the horrific nature of the wounds, the testimony of Dr. Truman and the other medical experts[3] is striking in its consistency, both as to the probable cause(s) of A.H.’s injuries and to the least likely reasons for his wounds. An external examination revealed bruises on the right forehead, on the right jaw, on the side of the face in front of the right ear, and on the thorax. The anterior chest area and abdomen contained 10-20 bruises, and a crescent-shaped bruise had broken the skin near the navel. Multiple small hemorrhages were observed along the retinal area behind the eyes. Dr. Brooks opined, within a reasonable degree of medical certainty, that such hemorrhaging is a characteristic result of violent, very rapid, and prolonged shaking of the head. The retinal injuries would not be expected from a fall from a slide onto grass or sand. The child also had a ruptured left ear drum and a cornerstone fracture of the femur (thigh bone). Considered along with the scattered pattern of the bruises, the head and ear drum injuries suggested blows or violent contact with a flat object such as a hand. The large abdominal bruises were consistent with knuckle prints resulting from multiple blows or shaking or very forceful blunt trauma. Dr. Truman opined, within a reasonable degree of medical certainty, that the crescent-shaped *1214 bruising near the navel was caused by fingerprints or knuckles. The fracture of the femur was characterized as a classic sign of shaken and battered children who have been subjected to a great deal of force or twisting. Additionally, A.H. had a very large tear in the liver, an injury that would have required a tremendous amount of blunt injury or blunt force, such as from a powerful and violent squeeze, punch, stomp, or kick. Truman opined that the liver wound would have required “every ounce of someone’s grip.” A CT scan disclosed suggestions of swelling and hemorrhaging in the brain, which indicated very forceful shaking or battering of the child. In Truman’s opinion, the entire constellation of injuries “absolutely” raised the possibility of child abuse. The wounds in toto were entirely inconsistent with A.H.’s falling from the top of a nine-foot object such as a slide onto a grassy, sandy area. Truman testified that 90 per cent of the injuries could have resulted primarily from the forceful grabbing of the baby’s abdominal area and shaking him. Assuming that someone had grabbed A.H. and shaken him very hard, Truman opined that the perpetrator’s hands and fingers would have had to change positions on the child’s body multiple times to cause the scattered distribution of bruises. All the bruises were very recent, and their coloration was consistent with their occurring at the same time as the brain and liver injuries. However, the facial injuries could have occurred an hour earlier than the others and could have resulted from hitting a bed or wall. Truman testified that he had seen up to 150 cases of alleged child abuse or sexual child abuse. He opined, within a reasonable degree of medical certainty, that unquestionably the victim was shaken and/or battered very forcefully. This shaking action would have been “extremely violent” and would have taken longer than a few seconds. In an incident involving very violent shaking, such injuries could have occurred with 10-20 seconds.
Dr. Moorer, a pediatric member of the Child Protection Team who had seen scores of physically battered children and had examined A.H. on December 5, testified that the total injuries led to only one conclusion: the child died from battering. He opined that the brain injury was caused by shaking. Its effects would have been immediate and very dramatic, in the form of altered respiration and loss of consciousness.
Swelling of the brain was the actual cause of death. Dr. Truman described “decerebrate posturing” as one manifestation of a “very injured brain,” where the hands become fist-like and turn out and down at the individual’s side.
Dr. Stewart, who performed the .autopsy of A.H. on December 6, 1996, testified that the cornerstone fracture was caused by shaking oh twisting. The brain and retinal injuries were consistent with “shaken baby” syndrome and most likely resulted from forceful shaking. An abdominal blow most likely caused the liver injury. Stewart opined that in all likelihood, the brain injury caused a very rapid loss of consciousness. It is possible that the child would not have cried after the injuries were inflicted.
When he was called back as a defense witness, Dr. Truman testified that the brain injury and liver laceration would have rendered A.H. nearly comatose and would have been immediately apparent to anyone. To someone untrained in medicine, the effects of the brain injury and the comatose state reasonably could have resembled a deep sleep. Truman opined that the injuries could have been inflicted in as few as 15 seconds or as many as 45 minutes. He said that at the hospital on December 5, Howard told him that A.H. had awakened around 5:00 A.M. with a temperature of slightly more than 100 degrees, had fallen asleep, and by 8:00 A.M. was his usual, playful self. Howard reported that A.H. had vomited after breakfast. Truman confirmed that Howard initially had reported taking A.H. to the playground, where the child allegedly sustained a fall from a slide.
Another defense witness, Dr. Williams, testified that he had reviewed a series of *1215 radiographs taken from December 4 through December 6, 1996, as well as Dr. Truman’s findings. Williams opined that a femur cornerstone fracture can result from vigorous, forceful twisting or shaking, but not from a direct blow or a fall from a high slide. He concluded that the injuries other than the wounds to the brain resulted from prolonged shaking rather than from one quick act. The laceration of the liver suggested a direct blow delivered with a significant amount of force. Within a reasonable degree of medical certainty, Williams opined that the overall injuries resulted from violent shaking and direct blows.
At the end of the State’s case-in-chief, defense counsel moved for a judgment of acquittal as to both charges. As to the premeditated first-degree murder charge, counsel noted the absence of any evidence of a motive for Washington to harm or kill the victim. Pointing to the nature of the wounds, counsel argued that “there is every reason to believe that these injuries were inflicted in a moment of rage without any sort of premeditation.” As to the charge of aggravated child abuse, counsel suggested that the evidence allowed “the very real possibility that these [injuries] were inflicted in a moment of anger without any specific intent.” Counsel also challenged the State’s proof regarding the identity of the perpetrator. The motion was denied.
Washington correctly states the rule that in a circumstantial-evidence case such as the case at bar, the State must exclude every reasonable hypothesis of innocence, no matter how forcefully the evidence indicates guilt. Mungin v. State, 689 So.2d 1026, 1029 (Fla.1995); State v. Law, 559 So.2d 187, 188 (Fla.1989) (in circumstantial-evidence case, motion for judgment of acquittal should be granted “if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt”). The State need not “rebut conclusively every possible variation” of events, but need only “introduce competent evidence which is inconsistent with the defendant’s theory of defense.” Law, 559 So.2d at 189. In Cochran v. State, 547 So.2d 928, 930 (Fla.1989), the Supreme Court of Florida stated:
The circumstantial evidence standard does not require the jury to believe the defense version of facts on which the state has produced conflicting evidence, and the state, as appellee, is entitled to a view of any conflicting evidence in the light most favorable to the jury’s verdict.
Washington contends that the hypothesis of innocence that the State failed to exclude is that A.H.’s death was caused not by someone with a premeditated intent to kill, or even an intent to cause great bodily harm, but by someone who inflicted the injuries in a moment of sudden anger or frustration, without any thought as to what harm the baby might suffer. However, Washington acknowledges that the manner of the commission of the homicide, and the manner and nature of the victim’s wounds, may be circumstantial evidence to establish premeditation. Holton v. State, 573 So.2d 284 (Fla.1990); Larry v. State, 104 So.2d 352, 354 (Fla.1958).
Given these general principles, the trial court’s role in assessing Washington’s motion for judgment of acquittal was as follows:
[T]he sole function of the trial court on motion for directed verdict in a circumstantial-evidence case is to determine whether there is prima facie inconsistency between (a) the evidence, viewed in the light most favorable to the State and (b) the defense theory or theories. If there is such inconsistency, then the question is for the finder of fact to resolve. The trial court’s finding in this regard will be reversed on appeal only where unsupported by competent substantial evidence.
Orme v. State, 677 So.2d 258, 262 (Fla.1996). The law is clear that a trial court should rarely, if ever, grant a motion for judgment of acquittal on the issue of in *1216 tent. King v. State, 545 So.2d 375 (Fla. 4th DCA 1989). This is because proof of intent usually consists of the surrounding circumstances of the case. A directed verdict is not proper where reasonable persons might differ as to facts tending to prove ultimate facts or inferences to be drawn from the facts. Snipes v. State, 154 Fla. 262, 17 So.2d 93 (1944).
Contrary to the defense’s assertion that this is a circumstantial-evidence case, the State contends that the case includes material direct evidence as well. Specifically, the State argues that Washington de facto confessed to the charged crimes during his police interview. To reach this conclusion, the State makes several assumptions. First, the State assumes (correctly) that under any reasonable construction of the evidence, there were only two possible perpetrators of the crime, Washington and Howard. Defense counsel conceded this point in closing argument. Second, the State assumes that the crime could have occurred only inside Howard’s apartment. This assertion is supported by the evidence that when Washington returned from the playground with A.H., Howard had the opportunity to observe the child and did not immediately see anything in A.H.’s appearance or behavior that would raise a concern for his well-being. In fact, Howard soon left her residence to run errands, and she left Washington to watch over the two babies.' Other than the trip to the playground, A.H. remained inside the residence at all times during the only period when the wounds could have been inflicted. Third, in his police interview, Washington denied committing the crimes, but he also said that Howard was never left “alone” in the residence with A.H. and Terrance, Jr. Washington indicated that he always was within earshot of the victim. Relying on these statements by Washington, the State asserts that Howard could not have inflicted the fatal injuries upon the victim, for Washington would have seen or heard her do so. To support its theory that Howard did not commit the crimes, the State focuses also on Washington’s statements to the authorities that Howard had not shaken A.H. in Washington’s presence.
The State’s third assumption is faulty for several reasons. Although the layout and dimensions of Howard’s apartment were not definitively set forth at the trial, it is evident from Washington’s and Howard’s statements to the police that the residence was compartmentalized, with more than just a single room and with at least two different sleeping areas. Thus, Washington correctly notes that the fact that Howard was never actually “alone” in the apartment with the babies does not eliminate the reasonable possibility that Howard was in a different part of the residence (where the babies slept) with A.H. and Terrance, Jr., for an undetermined length of time while Washington continued to watch television, and until Howard called for Washington to come back to the room and assist her with the child in distress. Significantly, some of the medical evidence supports the conclusion that if the wounds were inflicted in a certain manner, the victim would have been rendered almost immediately unconscious and would not necessarily have cried out. Thus, if Washington was, indeed, in a different area of the apartment, he may ndt have seen or heard what happened initially when Howard went back to A.H.’s room. Therefore, the State’s argument that Washington’s “confession”— that Howard was never left “alone” in the residence — is direct evidence that conclusively supports the denial of the motion for judgment of acquittal is not supported by the record.
The point of this digression is that the case at bar consists entirely of circumstantial evidence. The State pursued both a premeditated first-degree murder and a felony murder theory at trial, and the jury was so instructed.[4] After carefully review *1217 ing the evidence, we conclude that, under either theory, the State made a prima facie case to support the charges and that the trial court properly denied Washington’s motion for judgment of acquittal. In his police interview, Washington admitted that on December 4, 1996, he was A.H.’s sole custodian during the visit to the playground and during Howard’s subsequent absence from the apartment while she ran errands. The nature and extent of the injuries to A.H. support the State’s theory that Washington had sufficient time to form the requisite intent.
Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.
Asay v. State, 580 So.2d 610, 612 (Fla.1991); Wilson v. State, 493 So.2d 1019 (Fla.1986) (whether a premeditated design to kill was formed prior to killing is a question of fact for the jury that may be established by circumstantial evidence). The physicians’ testimony established that the infliction of the victim’s injuries could have taken anywhere from 10 seconds to 45 minutes. Furthermore, the injuries were to all parts of the child’s body, including his brain, his eye, his liver, his thigh bone, and his abdomen. He was extensively bruised all over. The doctors opined that the various injuries were consistent with violent shaking and with forceful punching, hitting, or stomping. The evidence suggested that a change in technique and in the positioning of the perpetrator’s hands would have been required to inflict the different types of internal and external injuries, and such changes would have required pauses, allowing further time for reflection. Given this evidence, the trial court properly denied this motion as well as the renewed motion made at the end of all evidence.[5]
Alternatively, under a felony murder theory, the focus is upon the underlying offense, which, in the case at bar, is aggravated child abuse. According to section 827.03(2)(a), Florida Statutes (1997), aggravated child abuse, a second-degree felony, happens when a person “[cjommits aggravated battery on a child.” A battery is “aggravated” when the perpetrator “[intentionally or knowingly causes great bodily harm, permanent disability, or permanent disfigurement.” § 784.045(l)(a)l, Fla. Stat. (1997); Knott v. State, 573 So.2d 179 (Fla. 2d DCA 1991) (to commit aggravated battery, which is a specific-intent crime, perpetrator must have “intent to cause great bodily harm, permanent disability or permanent disfigurement”). As noted earlier, “intent” is usually an appropriate question for the finder of fact to decide. Given the varied and extensive nature of the brutal injuries to the 11-month-old victim, we find ample support for sending the question to the jury under the State’s felony murder theory.

Restriction of Cross-Examination of Nafeesa Howard

The victim’s mother was a key witness in the State’s case against Washington. “When a witness takes the stand, he ipso facto places his credibility in issue.” Mendez v. State, 412 So.2d 965, 966 (Fla. 2d DCA 1982); Chandler v. State, 702 So.2d 186 (Fla.1997); C. Ehrhardt, Florida Evidence § 608.1 at 416 (1999 ed.). *1218 During the direct examination of Howard concerning the events of December 4, 1996, the prosecutor asked whether she had punched, struck, or violently shaken the child; or slapped his face; or otherwise hurt him at any point. She answered in the negative.
In cross-examination, defense counsel elicited Howard’s testimony that she was 19 years old, and Washington was 16, when. A.H. died. Howard agreed that she was at least as tall as Washington and probably weighed a little more than he did. She admitted that A.H.’s natural father was not much help. Within one or two months of the birth of A.H., Howard became pregnant with Terrance, Jr., who is Washington’s natural child. . Howard acknowledged that it had been pretty obvious that she was not going to get much help from Washington, who was only 15 years old when their child was conceived. Although Howard’s mother had assisted in the care of A.H., Howard began to assume more responsibility for him shortly before the baby’s death. While admitting that her situation had been pretty tough and difficult, Howard denied ever losing her temper with the two children.
When defense counsel sought to question Howard further as to whether she had ever become angry with the children, the prosecutor objected on the ground that the questioning exceeded the temporal scope of direct examination. The trial court sustained the objection. Subsequent objections were sustained as well, when counsel asked whether Howard had ever said she was tired of A.H. or had ever said that she had not meant to kill her baby. The trial judge announced that counsel’s questions in that regard would be limited to “the relevant date.” When asked how one could tell whether and when she was telling the truth, Howard answered “I don’t know.” On redirect examination, Howard was asked to assume that she was a frustrated single mother with two children. The prosecutor further asked: “[I]s there anything to have prevented you from beating and shaking Terrance Washington, Junior?” Howard answered: “I wouldn’t do that.” In further questioning about her acts specifically on December 4, 1996, Howard denied shaking, mistreating, stomping, or kicking A.H.
To the extent that Howard denied committing the December 4, 1996, crimes and denied knowing anything about how the child’s injuries occurred, her testimony was critical to the State’s case. Under the particular facts of this case, her denials of any responsibility were tantamount to her pointing to Washington and saying “You killed my baby.” The disclosure of a witness’ motives in testifying is “a proper and important function of the constitutionally protected right of cross-examination.” Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). A criminal defendant’s constitutional protections cover the right to pursue a full cross-examination of a State witness to expose any bias or improper motive that the witness may have in' testifying against the defendant. Powe v. State, 413 So.2d 1272, 1273 (Fla. 1st DCA 1982); Chatman v. State, 687 So.2d 860 (Fla. 1st DCA 1997); Taylor v. State, 623 So.2d 832 (Fla. 4th DCA 1993). The Florida Evidence Code reinforces the principle that adequate cross-examination presupposes the right to address questions dealing with a witness’ credibility:
Cross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in its discretion, permit inquiry into additional matters.
§ 90.612(2), Fla. Stat. (1997); Sanders v. State, 707 So.2d 664, 667 (Fla.1998).
The trial court allowed defense counsel to make a proffer in which Howard testified 1) that she had never lost her temper with her children; 2) that she had never become angry enough to hit, punch, or beat them; 3) that she had never said she could not stand A.H. or she wished he were not there; 4) that she had never punched A.H. in the presence of Jackie Hayes; 5) that she had never punched or *1219 slapped A.H. in the presence of Lashawan-da Bell; 6) that she had never hit, or thrown a shoe at, A.H. in front of 9-year-old Lakecia Tucker; and 7) that she had never said to Nikki Allen or Danasha Wilson: “I didn’t mean to kill my baby.” On proffer, Howard said that she knew of no reason why Washington would have hurt A.H. She denied that Washington had ever hit, shaken hard, or otherwise hurt A.H. prior to the fatal incident. Howard explained that a bad burn on the back of A.H.’s hand (about a month before his death) was the result of the baby’s pulling the cord and causing a hot iron to fall off the ironing board onto the floor while Howard was out of the room. Although the trial court decided that defense counsel would not be limited strictly to December 4, 1996, in cross-examining Howard, the proffered testimony summarized above was deemed inadmissible as “improper interrogation.”
Washington argues that by precluding the defense from cross-examining Howard generally about “matters affecting the credibility of the witness,” and specifically about the defense theory that Howard herself might have committed the crime and, thus, might have had a powerful motive to testify falsely against Washington, the trial court violated his right to confrontation, as guaranteed by the federal Sixth Amendment and Article I, § 16, of the Florida Constitution. We agree that Washington was denied constitutional rights. Lewis v. State, 570 So.2d 412, 416 (Fla. 1st DCA 1990) (“It is, of course, fundamental that a criminal defendant has a constitutional right to full and fair cross-examination to show a witness’ possible bias or motive to be untruthful.”). “[I]t is not necessary that matters tending to show bias, prejudice, or improper motive be within the scope of direct for such questioning to be proper cross-examination.” Nelson v. State, 602 So.2d 550, 552 (Fla. 2d DCA 1992). In Sanders, the Supreme Court of Florida stated:
[Limiting cross-examination in a manner that precludes relevant and important facts bearing on the trustworthiness of testimony constitutes error, especially when the cross-examination is directed at a witness for the prosecution.
707 So.2d at 667. Given the circumstantial nature of the case, the apparent lack of any motive for Washington to harm the infant victim, and the exculpatory nature of the witness’ proffered testimony, we cannot say beyond a reasonable doubt that the undue restriction of the cross-examination of Howard did not affect the verdict. Therefore, the limitations upon cross-examination constituted harmful error. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).

Exclusion of Proffered Evidence of Prior Attacks Upon A.H.

In an effort to raise a reasonable doubt as to Washington’s guilt of either charged offense, to demonstrate Howard’s inconsistent statements, to suggest that Howard had an improper motive to testify against Washington and should not be believed, and to prove the identity of the abuser and killer, the defense proffered the testimony of several witnesses.[6] Jacqueline Hayes, a teacher at a child care center, testified that -she met Howard .while living with her (Hayes’) niece, La-shawanda Bell, who was Howard’s neighbor. Hayes described an incident at her niece’s residence that occurred about two months before A.H. died. She had observed the baby, A.H., hit Hayes’ nephew, causing the latter to cry. Howard then called A.H. over to her, punched the baby in the chest hard enough to knock him down and cause him to cry, snatched or grabbed him by one arm and shook him, and threw him on the couch before giving him a pacifier. Hayes had warned Howard that the law would get her because that was no way to treat a child.
*1220 Lashawanda Bell, age 20, testified that she was a good friend of Washington but was no longer a friend of Howard, her upstairs neighbor. She used to see Howard and her children every day, and Bell spent a lot of time with them. Bell described Howard as having very little patience and tending toward roughness with A.H. Howard would become angry when the baby whined or nagged. When Howard got mad, Bell had observed her on many occasions picking up A.H. by the arms and shaking him, beating him, slapping him, hitting him on the back with her knuckles as if knocking on a door, and talking cruelly to him. Bell said that such incidents occurred anytime and anywhere (including at home, at the mall, or at school) throughout the baby’s short lifetime. Whenever Bell told Howard that her treatment of A.H. was wrong, Howard either got mad and took the child away or acted “as if she didn’t care.” One night, Howard said she had dropped the child or he had fallen on the steps, scraping his lip and causing it to bleed. The trial court ruled the testimony of Hayes and Bell inadmissible because none of Howard’s acts described by those witnesses rose to the level of aggravated child abuse.
The defense sought to introduce witness Dawn Payne, who was prepared to testify that she had overheard an angry Howard say to A.H.: “I can’t stand you. I wish you weren’t here.” The defense also asked to introduce witness Tory Walker, who would testify that she had seen Howard sling A.H. hard into a couch and “pop” him. The trial court accepted defense counsel’s argument as an adequate proffer and ruled this testimony inadmissible.
Defense counsel then proffered the testimony of three additional witnesses. Defense counsel said that Lakecia Tucker would testify that not long before the death of A.H., Howard got angry and threw a shoe, striking the child. On proffer, Tawana Allen testified that her baby’s godmother is Washington’s cousin. Allen knew of Howard but did not know her personally. Allen recalled the night of December 5, 1996, the date of A.H.’s death, when she and Karen English visited Danasha Wilson’s house. Allen said she had walked in on a conversation in which Howard said that she had not meant “to do that” to her baby. When Wilson asked specifically what she meant, Howard had answered that she did not mean to kill her baby, that it was an accident. Allen admitted that she had not heard the entire conversation. Allen testified that Howard was smiling and had on “a happy face” that night.
The State objected to Allen’s testimony on the ground that it was inadmissible hearsay. Next, the defense proffered the testimony of Washington’s 21-year-old cousin, Danasha Wilson, who said she knew Howard through Washington and through being locked up with her at the juvenile detention center. Wilson testified that on the night of A.H.’s death, Tawana Allen, Karen English, and Howard were at Wilson’s apartment. When asked what had happened, Howard recounted three different stories about the events of December 4. As Karen English began to argue with Howard after “catching her in lies,” Howard responded that she did not have to explain anything to them and “didn’t mean to do that” to her baby. When English asked what Howard meant, she answered: “I ain’t mean [sic] to kill my baby.” Upon further inquiry, Howard repeated this statement several times.
After these proffers, defense counsel argued that credibility was an issue at the trial and that it was important for the defense to demonstrate that Howard had made a number of material inconsistent statements. The State replied that the proffered testimony was inadmissible. The trial court refused to admit any of the proffered testimony. Referring to Howard’s alleged remarks that she had not meant to kill her baby, the trial judge said that “given the context of the alleged statement, it certainly appears that it’s highly unlikely the statement was ever made, but looks like the people who allegedly heard it were wanting to hear it, and *1221 probably misconstrued what she said.” In concluding that the several witnesses who were present on December 5 either had not really heard Howard make those statements or had misconstrued the meaning of her words, the trial judge impermissibly usurped the authority of the jury to assess the witnesses’ credibility and to make factual determinations.
Washington contends that the exclusion of the proffered testimony constituted an abuse of discretion. He is correct. The constitutional guarantees of due process provide for the admission of evidence relevant to the defense of the accused, and it is clear that “[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.” Chambers v. Mississippi 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); Teemer v. State, 615 So.2d 234 (Fla. 3d DCA 1993); McCoy v. State, 580 So.2d 181 (Fla. 1st DCA 1991) (trial court’s failure to allow defendant to call detective as adverse witness and to impeach him through use of prior inconsistent statements regarding identification of defendant as perpetrator denied due process).
The Florida Evidence Code addresses the proper methods of impeachment to attack a witness’ credibility:
90.608 Who may impeach. — Any party, including the party calling the witness, may attack the credibility of the ■witness by:
(1) Introducing statements of the witness which are inconsistent with the witness’s present testimony.
(2) Showing that the witness is biased.
(3) Attacking the character of the witness in accordance with the provisions of § 90.609 or § 90.610.
(4) Showing a defect of capacity, ability, or opportunity in the witness to observe, remember, or recount the matters about which the witness testified.
(5) Proof by other witnesses that material facts are not as testified to by the witness being impeached.
§ 90.608, Fla. Stat. (1997). This provision is a proper basis for impeachment by showing that the witness made a statement before trial that is inconsistent with the witness’ testimony at trial. Gudinas v. State, 693 So.2d 953, 963-64 (Fla.1997) (State witness’ prior inconsistent statement was properly used for impeachment purposes only and was not inadmissible hearsay).
The applicability of this provision was discussed in Nelson, 602 So.2d at 550, and warrants closer examination. The defendant, Nelson, was alleged to have conspired with the victim’s estranged wife to commit murder, and to have committed first-degree murder, in a “contract murder” case. In the direct appeal of his convictions, Nelson argued that the trial court had improperly limited his cross-examination of the admitted triggerman, McKenzie, who was the only eyewitness to the events. In support of broader cross-examination, the defense argued to the trial court that it was trying to establish that the prior drug dealings between McKenzie and the murder victim provided the triggerman with his own separate and distinct motive to kill the victim. The defense wanted to show that McKenzie’s personal motive to kill the victim cast a reasonable doubt on McKenzie’s credibility when he claimed that the only reason he had committed the shooting was that Nelson had hired him for that purpose. The trial court correctly ruled that counsel could not question McKenzie about drug dealings generally but could inquire as to particular instances of drug dealing with the victim. Id. at 551-52.
The Second District Court described the lower court’s evidentiary ruling as follows:
This ruling correctly recognized that defense counsel could properly seek to establish a motive on McKenzie’s part which would exonerate the appellant or, at least, to provide a reasonable doubt as to McKenzie’s credibility and claim that the appellant was as guilty as McKenzie was.
*1222 Id. at 552; Marr v. State, 494 So.2d 1139 (Fla.1986). Addressing the fact that defense counsel’s questioning went beyond the scope of direct examination, the district court in Nelson stated:
Although this matter had not been touched upon during the direct examination of McKenzie, beyond the stock question from the prosecutor whether McKenzie had been previously convicted of a felony, it is not necessary that matters tending to show bias, prejudice, or improper motive be within the scope of direct for such questioning to be proper cross-examination.
Nelson, 602 So.2d at 552; Yolman v. State, 469 So.2d 842 (Fla. 2d DCA 1985) (it was reversible error not to allow defendant to cross-examine witness about telephone conversation that allegedly would have shown witness’ bias, prejudice, or improper motive for testifying against defendant, even though matter was not subject of direct examination). When the cross-examination continued after the trial court’s correct ruling, defense counsel asked McKenzie if he had ever had drug dealings with the victim, whereupon the prosecutor’s objection was inexplicably sustained. The appellate court concluded that by so ruling, the trial court had erroneously prevented Nelson from impeaching McKenzie. Specifically, the erroneous ruling was found to contravene section 90.608, Florida Statutes, because it deprived the defense of the opportunity to conduct a full cross-examination of McKenzie, a crucial State witness, in an effort to impeach the witness by showing his bias and improper motive. Nelson’s conviction was reversed and the cause remanded for a new trial. Nelson, 602 So.2d at 552.
In the case at bar, defense counsel sought to introduce prior statements made by Howard that are inconsistent with her trial testimony, and thereby challenge her credibility and show her bias or improper motive. “Relevant evidence is evidence tending to prove or disprove a material fact.” § 90.401, Fla. Stat. (1997). Except as provided by law, “[a]ll relevant evidence is admissible.” § 90.402, Fla. Stat. (1997). Whether Washington was the perpetrator of the acts upon A.H. and, if so, whether the fatal injuries were accidentally inflicted, were material issues at trial. The jury could believe either Washington’s denials of wrongdoing made during his interviews with the police, or Howard’s denials of wrongdoing made during her live testimony. The evidence suggesting that the State’s key witness herself had repeatedly physically mistreated the victim (by acts consistent with the subsequent fatal abuse) over a period up to the time of his death, had verbalized her negative feelings about the child, and had repeatedly said on December 5 that she had not meant to kill her baby, is “relevant” to material issues of fact. By testifying that she had never hurt A.H., Howard opened the door for the defense to impeach her. Geralds v. State, 674 So.2d 96 (Fla.1996) (in prosecution for first-degree murder, defendant’s denial during direct examination that he murdered victim “opened the door” for cross-examination or impeachment with evidence that linked defendant to the murder); Allred v. State, 642 So.2d 650 (Fla. 1st DCA 1994) (in prosecution for aggravated battery, defendant’s claim of lack of violent propensity and his assertion that he would not strike a woman “opened the door” for admission of testimonial evidence that defendant had hit his first wife and a former girlfriend). However, the jury was denied the opportunity to hear this crucial evidence. That omission constitutes harmful error.
Aside from seeking to impeach Howard with her inconsistent statements, the defense sought to use so-called “reverse Williams[7] Rule” evidence to exculpate Washington. What this rule involves, and whether it is applicable here, was vigorously discussed at trial and is the subject of the challenged rulings. While Florida courts have agreed that “where evidence tends in any way, even indirectly, to estab *1223 lish a reasonable doubt of [a] defendant’s guilt, it is error to deny its admission,” it is also true that “the admissibility of this evidence must be gauged by the same principle of relevancy as any other evidence offered by the defendant.” Rivera v. State, 561 So.2d 536, 539 (Fla.1990) (in first-degree capital murder trial, defendant was not entitled to introduce evidence of crime of “similar nature” that was committed while he was in custody; dissimilarity in ages and appearances of victims and causes of death rendered evidence irrelevant). “If there is any possibility of a tendency of evidence to create a reasonable doubt, the rules of evidence are usually construed to allow for its admissibility.” Vannier v. State, 714 So.2d 470, 472 (Fla. 4th DCA 1998) (in murder prosecution, exclusion of evidence that might have tended to show that decedent committed suicide rather than was murdered was not harmless error).
According to section 90.404(2)(a), Florida Statutes (1997), which codified Williams, 110 So.2d at 654:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
In Brown v. State, 513 So.2d 213, 215 (Fla. 1st DCA 1987), we commented on the potential uses of Williams Rule evidence as follows:
While most cases generally involve the offer of similar fact evidence by the prosecution against a defendant in a criminal case, there is nothing in the language of the statute which precludes the use of evidence offered by a defendant in a criminal case, or by the parties in a civil action.
Cf. Moreno v. State, 418 So.2d 1223, 1225 (Fla. 3d DCA 1982) (construing § 90.404(2) as applying “only to the use of similar crime evidence by the state against the defendant in a criminal trial,” and relying instead upon § 90.402 “relevant evidence” rule as proper basis for admissibility of erroneously excluded evidence of “similar crime” committed by State’s key witnesses). Professor Ehrhardt has addressed the misleading use of the term “similar fact evidence”:
[EJvidence of collateral crimes or acts is admissible under section 90.404(2)(a) not because it is similar to the crime or act in issue, but because it is relevant to prove a material fact or issue in'the instant case other than the defendant’s propensity or bad character. [Footnote omitted].
C. Ehrhardt, Florida Evidence, § 404.9 at 174 (1999 ed.); Bryan v. State, 533 So.2d 744, 746 (Fla.1988) (so long as evidence of “other crimes” is relevant and is not excluded by a rule of evidence, such evidence is not limited to “similar fact” crimes). The upshot is that an accused may show his innocence by proof tending to show another person’s guilt. In Interest of K.C., 582 So.2d 741 (Fla. 4th DCA 1991) (in delinquency proceeding alleging indecent assault upon 6-year-old female, where accused juvenile adamantly denied any guilt whatsoever and testified that he had “told on” victim’s brother, possibly creating motive for victim and her brother to give false testimony against accused, and State’s medical evidence revealed that hymenal tears in victim could have occurred earlier than charged offense, trial court reversibly erred by excluding proffer of relevant testimony of victim and her brother indicating that victim had engaged in sexual intercourse with another boy on several earlier occasions); Moreno, 418 So.2d at 1225-26; Barnes v. State, 415 So.2d 1280 (Fla. 2d DCA 1982). Although Rivera stands for the proposition that the defense is bound by the same rules of evidence as the State, 561 So.2d at 539, the issue of what is relevant to show a reasonable doubt can invoke different considerations from the question of what is relevant to prove the commission of the crime itself. Vannier, 714 So.2d at 472.
*1224 The alleged “other crimes, wrongs, or acts” at issue in the instant case are Howard’s prior, recent shaking, punching, beating, snatching, and hitting of A.H., whom Washington was charged with killing. If the other crime, wrong, or act has “startling similarities,” such as a unique “signature,” “hallmark,” or “fingerprint” modus operandi, or a common plan or scheme, it may be used to prove the identity of the perpetrator of the crime at hand. Chandler, 702 So.2d at 192; Drake v. State, 400 So.2d 1217, 1219 (Fla.1981) (“A mere general similarity will not render the similar facts legally relevant to show identity. There must be identifiable points of similarity which pervade the compared factual situations.”); Robinson v. State, 522 So.2d 869 (Fla. 2d DCA 1987) (in prosecution for burglary of structure and sexual battery of N.L. with threat or force, trial court improperly admitted evidence of subsequent break-in that culminated in sexual battery of D.K., where offense upon D.K. occurred within same year as attack upon N.L., both victims were elderly, and the two incidents occurred at the same time of night and within six blocks of each other; the perpetrators’ methods of operation differed significantly); State v. Mais-to, 427 So.2d 1120, 1122 (Fla. 3d DCA 1983); Sias v. State, 416 So.2d 1213 (Fla. 3d DCA 1982). This does not require the other crime, wrong, or act to be “absolutely identical to the crime charged.” Gore v. State, 599 So.2d 978, 984 (Fla.1992). For example, evidence of a plan or motive may be relevant and admissible to establish identity. Talley v. State, 160 Fla. 593, 36 So.2d 201 (1948) (in prosecution for rape, where adequate limiting instruction was given to jury, collateral crime evidence was properly considered to prove identity and plan or design). In language anticipating the holding in Williams, the Supreme Court of Florida said in Talley:
Evidence of other crimes may be admitted when it tends to establish a common scheme or plan embracing the commission of a series of crimes so related to each other that proof of one tends to prove the other, and to show the defendant’s guilt of the crime charged. Subsequent as well as prior collateral offenses can be put in evidence and from such system, identity or intent can often be shown. Like crimes, committed against the same persons, at about the same time, tend to show the same general design and evidence of the same is relevant and may lead to proof of identity-
36 So.2d at 204-05.
Even without the requisite higher degree of similarity to prove identity, evidence of other crimes, wrongs, or acts may properly be used to prove, e.g., motive, intent, plan, or absence of mistake. Jorgenson v. State, 714 So.2d 423 (Fla.1998) (in first-degree murder prosecution, evidence of defendant’s drug-dealing was relevant to support State’s theory of motive, where evidence suggested that defendant regularly used victim as delivery person, that victim had stolen from defendant, that defendant was angered by victim’s abundant use of methamphetamine, and that victim had threatened to turn in defendant if he cut off victim’s drug supply); Finney v. State, 660 So.2d 674, 681-82 (Fla.1995); Evans v. State, 693 So.2d 1096, 1101 (Fla. 3d DCA 1997). Evidence of collateral crimes, wrongs, or acts committed by a suspect other than the accused has come to be known in Florida as “reverse” Williams Rule evidence, and it is admissible so long as it meets the test of relevance. State v. Savino, 567 So.2d 892, 893 (Fla.1990) (defendant may introduce “reverse” Williams Rule evidence for exculpatory purposes, if relevant); Rivera, 561 So.2d at 539. The supreme court in Savi-no stated that “[i]f a defendant’s purpose is to shift suspicion from himself to another person, evidence of past criminal conduct of that other person should be of such nature that it would be admissible if that person were on trial for the present offense.” 567 So.2d at 894.
The medical experts testified that A.H. died because someone repeatedly grabbed the baby and violently shook or twisted *1225 him, and some of the evidence indicated that someone may have battered him and punched him with the knuckles, leaving extensive bruises. The defense sought to introduce evidence of Howard’s recent physical punishment of A.H. to show her motive;' to raise a reasonable doubt as to Washington’s guilt; and to suggest to the ' jury that it was she, and not Washington, who had killed the child in an either intentional or accidental manner. The jury was denied the opportunity to hear either Hayes’ testimony that Howard had punched A.H. in the chest, had knocked him to the ground, and then had snatched him by the arm and shaken him before throwing him onto the couch; or Bell’s testimony that Howard was prone to anger and frequently had hit A.H. with her knuckles, had beat him on the back, and had picked him up by the arms and shaken him. Hayes’ and Bell’s eyewitness accounts indicated that these abusive physical acts had been ongoing and continued to the time of the child’s death.
Under the rule set out in Savino, if the defense intended to shift suspicion from Washington to Howard, the evidence of Howard’s physical attacks upon the child had to be “of such a nature that [the evidence] would be admissible if [she] were on trial for the present offense.” 567 So.2d at 894. The State argues that, given the tragic incidence in today’s society of children’s being physically battered, with sufficient frequency that medical experts have identified a condition known as “shaken baby syndrome,” see Dixon v. State, 691 So.2d 515, 516 (Fla. 1st DCA 1997), the extensive and rough physical mistreatment of baby A.H. is not unique or even unusual, so as to be relevant to establish the identity of the perpetrator. The trial court ruled that the proffered evidence of Howard’s recent, repeated physical attacks upon the victim was not relevant because it did not constitute aggravated child abuse. We are simply unable to conclude that the evidence of Howard’s very recent, ongoing violent acts upon the same 11-month-old child would have to rise to the level of aggravated child abuse — that is, cause great bodily harm, permanent disability, or permanent disfigurement — -before they became relevant to suggest who fatally injured the child shortly thereafter, on December 4, 1996.[8] In Williams and its progeny, “the Florida Supreme Court has for some time adhered to a broad rule of admissibility based on the relevancy of the evidence to a fact to be proved.” Snowden v. State, 537 So.2d 1383, 1384 (Fla. 3d DCA 1989) (in prosecution for sexual battery of 4-year-old girl and 6-month-old boy, admission of evidence tending to show that defendant had molested another 5-year-boy and another 6-year-old girl did not deny defendant a fair trial, where State used “similar fact” evidence to show identity and to rebut contention that 4-year-old victim was lying, and jury was properly instructed as to use of collateral crime evidence). We believe the proffered evidence satisfies the intent of Williams and the requirements of Savino. In addition, we conclude that this evidence of Howard’s very recent physical mistreatment of the same victim, in a manner strikingly consistent with the types of acts that very likely caused his fatal injuries, is relevant to show her intent, plan, or state of mind toward A.H. and her motive to testify falsely against Washington, the only other possible suspect. Talley.
Our determination is reinforced by the absence of evidence that Washington had any motive or reason whatsoever to commit the criminal acts of which he was convicted. In fact, Detective Marsh testified that in his interview, Washington had said that A.H.’s natural father did not spend much time with the child. Washing *1226 ton had taken A.H. to visit Washington’s mother, and when the child would stay over with them during those visits, he was treated as a member of the family and received new outfits and Pampers. Marsh said that Washington had indicated his care and love for the child. In summary, we conclude that the trial court abused its discretion by excluding evidence of Howard’s recent, repeated physical mistreatment of A.H.

Propriety of the State’s Deathr-Qualifying the Jury

The State may not death-qualify a jury in a case in which it appears the death penalty may not be imposed as a matter of law. Reed v. State, 496 So.2d 213 (Fla. 1st DCA 1986) (trial court’s erroneously permitting jury to be death-qualified resulted in number of otherwise qualified prospective jurors’ being eliminated from participation in homicide prosecution and, thus, could not be considered harmless), rev. den., 504 So.2d 768 (Fla.1987); Lark v. State, 617 So.2d 782, 784 (Fla. 1st DCA 1993). In this final issue, Washington argues that the State improperly sought the death penalty in this case. In support of this claim, Washington contends that the death-qualification of a jury in inappropriate circumstances “probably” creates juries from which a disproportionate number of African-American citizens are excluded, and “quite possibly” results in juries that are more prone to convict the accused. Mere conclusions, unsupported by facts, cannot support a defendant’s claim of discrimination. On the record before us, we find no error in the State’s seeking the death penalty.
We REVERSE the judgment and sentence and REMAND for a new trial.
MINER, and BENTON, JJ„ CONCUR.

. Washington was not the father of the victim, A.H. However, the victim's baby brother, Terrance, Jr., is the child of Howard and Washington and was born about nine months after A.H.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The other physicians and their respective areas of expertise were Dr. Logan Brooks (ophthalmology), Dr. Samuel Moorer (pedia-tries), and Dr. David Stewart (forensic pathology). Dr. Charles Williams (pediatric radiology), a defense witness, testified via videotape.

. The verdict form listed the offense in Count One only as first-degree murder. Therefore, it is unclear whether the jury found sufficient evidence to establish premeditation. Given their guilty verdict in Count Two, the jury could have based their decision in Count One *1217 on a felony murder theory based on the underlying aggravated child abuse.

. We note that in determining that the motion for judgment of acquittal was properly denied at the end of the State's case, we have not considered any of the testimony that was given by the State’s original witnesses after they were called back during the defense's case. State v. Pennington, 534 So.2d 393 (Fla.1988) (where the State, in its case-in-chief, failed to make a prima facie case connecting defendant to drug transaction, the State could not rely on co-defendant's testimony on cross-examination during defense’s case to establish necessary threshold elements of drug offense against defendant). Of course, all the evidence was considered in leading us to conclude that the renewed motion for judgment of acquittal was properly denied at the end of all the evidence.

. Finding no error in the exclusion of the proffered testimony of Matilda Frazier and Tracy Davis, we address only the other proffered witnesses.

. Williams v. State, 110 So.2d 654 (Fla.), cert. den., 361 U.S. 847, 80 S.Ct. 102 (1959).

. Especially when considered cumulatively, the evidence in question goes well beyond the types of acts that could reasonably be deemed appropriate discipline upon an 11-month-old child. The proffered testimony about Howard’s punching the baby, shaking him hard and then throwing him upon the couch, and beating him on the back is clearly distinguishable from socially more acceptable behavior such as reasonable spanking.