**ALFRED SNIPES, alias ALFORD SNIPES, v. STATE OF FLORIDA**

17 So. (2nd) 93                                  January Term, 1944
March 10, 1944                                            En Banc

*W. W. Flournoy,* for appellant.

*J. Tom Watson,* Attorney General, *John C. Wynn,* Assistant Attorney General, and *J. Edwin Holsberry,* for appellee.

BUFORD, C. J.:

The record in this case was originally assigned to Mr. Justice CHAPMAN to prepare an opinion and judgment for the Court. He carefully and conscientiously prepared one with which the whole Court in the main agrees but in which the majority cannot concur for the reason that the conclusion reached in that opinion is that the judgment should be reversed and the cause remanded for judgment as for conviction of manslaughter.

The verdict of murder in the first degree was quite evidently the result of prejudice, as there is no evidence in the record to establish the element of premeditated design. Neither is there evidence sufficient to establish the necessary elements of murder in the second degree. Having reached this conclusion, it appears to us that we may no longer consider the verdict as fixing the fact of guilt of some degree of unlawful homicide and thereupon dispose of the case under the provisions of Sec. 310, Criminal Procedure Act by reversing the judgment with directions that judgment be entered adjudging the defendant guilty of a certain lesser degree of unlawful homicide of which the jury might have found the defendant guilty.

It is our view, in the light of what is said above, that unless we can say that we are convinced from the evidence

beyond a reasonable doubt that appellant was guilty of some certain degree of unlawful homicide, we should reverse the judgment and remand the cause for further proceedings.

We are not so convinced and, therefore, cannot concur in directing a judgment of guilty of any degree of unlawful homicide in this case.

The cause is reversed with directions that a new trial be had and conducted in the light of the views expressed both herein and in the opinion by Justice CHAPMAN that the evidence presented in this record is insufficient to support a verdict and judgment for murder in the first degree or of murder in the second degree.

So ordered.

TERRELL, BROWN, THOMAS, ADAMS and SEBRING, JJ., concur.

CHAPMAN, J., concurs in part.

CHAPMAN, J., concurring in part:

The appellant, Alfred Snipes, alias Alford Snipes, a colored man, was indicted for the crime of murder in the first degree of R. E. Gatlin, the then Sheriff of Walton County, Florida, by a grand jury of said County. The crime was alleged to have been committed by the defendant below on November 12, 1942, at his home in Walton County, Florida. The appellant was by the trial court adjudged insolvent and Honorable W. W. Flournoy, of the De Funiak Springs Bar, was appointed as counsel to represent the defendant below during the progress of the trial of the cause. He was placed upon trial, convicted of murder in the first degree, without recommendation, and by the trial court sentenced to death by electrocution, and therefrom has perfected his appeal here.

Counsel for appellant poses for adjudication here three questions, while the Attorney General expresses the view that two of the proposed questions, because of clarity, should be restated. We have carefuly considered the entire record. briefs of counsel, and, after hearing able oral argument at the bar of this Court, it is our conclusion that an answer to the following question will be a full answer to and dispose of

the case. The question is viz: Was the evidence as adduced during the progress of the trial legally sufficient to sustain the verdict and judgment for the crime of murder in the first degree? The answer to the question is found in an analysis of all the testimony.

The evidence discloses that the late Sheriff Gatlin, on November 12, 1942, accompanied by Deputy Sheriff Curtis Miller, went to the home of Alford Snipes, situated near De-Funiak Springs, for the purpose of searching it for contraband whiskey. The officers had obtained a search warrant (subsequently by the courts held fatally defective), and, after locating the defendant, apprised him of their mission and then delivered to him a copy of the search warrant and requested the privilege of searching his home for whiskey. He consented to the search, and, the house being locked went with the officers to the front door of his home, unlocked it, opened the front door, and invited them to make the search. The officers, in the presence of the defendant, entered the home and undertook the task of searching it.

The sheriff, followed by his deputy and the defendant, walked through the living room into the kitchen, and when about to enter the bedroom from the kitchen, the deputy told the defendant that the officers would make the search and for him to leave the bedroom, which he did; but turned and reached in the direction of a trunk then situated near the door in the bedroom. The deputy tesified that he told the defendant, "Get back Snipes," and upon telling him that the defendant "turned and looked at me like a wild man and I reached for my handcuffs and black jack, and he (the defendant) backed up to the west wall of the little dining room." "When I pulled my handcuffs and black jack out he (the defendant) backed over to the west wall of the room; then I started to put them back in my pocket,—in my handcuff case —my handcuffs, while he (the defendant) made a lunge and struck me. . . . I only hit him one time in the dining room, knocking him against the wall, and that's when I struck him." Q. "Where was it, as to position, when the first gun was fired, where was Snipes standing,—once more?" A. "Standing pretty close to the west wall of the dining room."

Q. "How many times did Mr. Gatlin fire?" A. "One time."
Q. "After the first shot was fired by Mr. Gatlin, what did you say, did you say you struck the defendant before or after the (first) shot was fired?" A. "Before."

When the three were in the dining room, the defendant was hit by Deputy Miller with a black jack and shot one time by the sheriff. The defendant, at the time, was not armed; the sheriff had a pistol and the deputy a black jack, handcuffs and a pistol. Subsequent strokes with the black jack, coupled with an effort to leave the dining room, resulted in the defendant falling on a settee in the living room, when the defendant and Deputy Miller clinched and tussled over the possession of a pistol. It fired three times during the struggle, to the best of his (deputy's) judgment. The Sheriff's pistol was a six-shooter. When introduced into evidence it had five empty cartridges and one unfired cartridge in the gun. The six shots are accounted for viz: the first fired by the sheriff at the defendant when in the dining room; the second by the defendant, killing the sheriff; and three fired in the struggle over the pistol, and the remaining unfired cartridge.

Pertinent portions of the testimony of Deputy Miller about the details of the fight resulting in the death of Sheriff Gatlin are viz:

"A . . .. I started to put the cuffs back in my case and he made a lunge and struck at me, and I lunged at him, and the Sheriff shot at him, and he wheeled around and dived for the door to the front room, and there's a settee over against the wall and he struck that and fell over. I was there by that time and reached at him with the blackjack and knocked him back on the settee, and we tied up there and got on the floor, and the sheriff come in from my right and as he come in I said 'hit him,'—we were fighting down on the floor, and I seen he was getting up with me and I told the sheriff to hit him with something.

"Q. Did he have you down then, on top of you?

"A. No, not at that time, but I seen he was going to get up with me, and by that time he throwed me flat on my back, and the sheriff made a step and struck at him and the gun

went off and I seen him fall back and he says 'Curt, he's shot me, he's got my gun,' and he turns around to me and told me 'I'm going to get you now.' and as he come at me I caught the gun with my right hand, got my hand on the trigger and went to shooting and shot till he fouled it, or it wouldn't shoot any more,—I didn't know if I'd emptied it, and so I reached and got the gun with my left hand, the barrel of the sheriff's gun, and I reached for my gun.

"Q. You had your gun?

"A. Had it right where it is now, and I came out shooting my gun, and as I come out with it he grabbed it, and I was shooting it till he fouled it, till I couldn't shoot it, and by that time he was up beating my face, was on top of me, and he struck me in the eye there, and I turned my head on the floor, like that, and he beat me up there side of the head.

"Q. Left side of your head?

"A. Yes,—and I asked him to let me up and he gritted his teeth and says 'I'll fix you,' and I begun twisting around, to get out from under him, and I got out from under him, up on my knees, and we both was holding my gun, and I got up on my knees,—he was kinda down between the partition wall of the house, and by that time I had him back against the wall, and I asked him to turn my gun loose, and he said 'you turn it loose,' and as he started to get up I slung him and the gun up against the wall, and I run out."

The defendant told Mr. Stephens, a road patrolman, that he took the deputy's gun after a tussle with him. He then stated, "to tell the truth, I don't know whether me or Mr. Curt (Curtis Miller) shot the sheriff. The defendant told the State's witnesses, Adam Johnson, that he shot the sheriff.

The defendant exhibited to the jury four gun shot wounds on his body sustained in the fight with the officers. Additional thereto was evidence of blackjack blows on his body inflicted by the deputy. When on the witness stand he denied firing the shot that killed the officer, but the inference drawn therefrom is to the effect that Deputy Miller killed the sheriff when firing his pistol at the defendant, or that the sheriff was killed by a shot from the gun over the possession of

which they tussled. Only two eye witnesses to the fight took the stand, viz: Deputy Sheriff Curtis Miller and Alfred Snipes. The defendant took possession of the two pistols of the officers left in the living room of his home and delivered them to a third party and ultimately the same were delivered to the officers and adduced in evidence at the trial of the cause. He denied making the incriminating statements to witnesses Stephens and Adam Johnson.

The record discloses that the defendant below, at the time the State announced that it rested its case, moved the court to direct the jury to render a verdict for the defendant below on the ground that the State failed to adduce sufficient testimony to sustain a verdict and judgment for the State of Florida. The motion was by the trial court overruled and denied. Likewise, a similar motion was presented to the trial court by counsel for defendant below when each of the parties announced that no further testimony was to be offered. This motion was denied.

It is settled law that directed verdicts should not be given if the testimony is conflicting or admits of different reasonable inferences tending to prove the issues. See State v. Bird, 128 Fla. 552, 175 So. 858. When there is room for differences of opinion between reasonable men as to proof of facts from which ultimate facts are sought to be established or where there is room for such differences as to inferences which may be drawn from conceded facts, the Court under the law is required to submit such issues to the jury. See Holland v. State, 129 Fla. 363, 176 So. 169.

In the case at bar certain testimony is to the effect that the appellant fired the shot that killed Mr. Gatlin. Likewise, testimony appears to the effect that the defendant did not fire the fatal shot, and these disputes and conflicts in the testimony are purely jury questions under our judicial system. Courts are powerless to interfere under these recognized conditions and circumstances. We hold that the record contains evidence amply sufficient to support the verdict of the jury to the effect that the defendant fired the shot that caused the death of the late Mr. Gatlin.

It is well established that the burden of proof necessary

to establish premeditation or an intent to kill required by law, and as alleged in the indictment in the case at bar, rested on the State of Florida. See Parker v. State, 142 Fla. 210, 194 So. 484. These are questions of fact that can or may be established by direct or circumstantial evidence to be considered and determined by the jury from all the evidence adduced, under appropriate instructions on the part of the trial court. See Robinson v. State, 148 Fla. 153, 3 So. (2nd) 804; Crawford v. State, 146 Fla. 729, 1 So. (2nd) 713. Whether or not the State, during the progress of the trial, carried the burden of proof cast upon it by law must be determined by an examination of the testimony appearing in the record on the controverted point.

We failed to observe, when studying the testimony, malice, ill will, or enmity existing between the deceased sheriff and Alford Snipes when the latter invited the officers into his home to search it for contraband whisky. Quite to the contrary, the deceased officer on the occasion reflected a respectful attitude toward the colored man and a similar demeanor was exhibited toward the officer by the colored man. The first clash between the parties developed when the house was being searched—it occurred when the appellant was near the door leading from the dining room into the bedroom. The colored man had reached for the trunk when the deputy ordered him out of the bedroom, which order was by the defendant immediately obeyed. He appeared to the deputy like a "wild man." The deputy then struck the defendant with a blackjack; the defendant lunged at the deputy; the sheriff then shot the defendant in the back; another lick with the blackjack when the defendant jumped through the door from the dining room into the living room and fell on a settee, and was immediately covered by the deputy and shortly thereafter followed the shot that killed the officer. The defendant emerged from the altercation with several blackjack blows and four pistol shot wounds about his body.

The defendant on the occasion was not armed, but he later admitted that in the trunk near the entrance door to the bedroom at the time was his 32 caliber pistol. The evidence

discloses a continuous fight between the deputy and the defendant. It is not claimed that the officers at the time had a warrant authorizing the defendant's arrest, nor is it shown that the defendant had violated any law in their presence, thereby authorizing his arrest. The deceased officer never personally participated in the altercation, except striking and the firing of one shot into the back of the defendant when the fight between the deputy and the defendant first started in the dining room. The three other wounds in the body of the defendant are not satisfactorily accounted for in the testimony. The evidence fails to disclose any act or deed or conduct on the part of the defendant during the entire altercation sufficient in law to constitute premeditation of an intent to then kill the deceased officer. The officers, as shown by the testimony, were on the occasion each well armed and the defendant was not. Common sense dictates that under these conditions and circumstances the slightest act of hostility toward the officers on the part of the defendant would not only have been unwise on his part, but his personal safety would have been immediately jeopardized.

The law of premeditation or intent to kill is viz: An essential element of murder in the first degree is premeditated design and in order to constitute murder in the first degree it must be established beyond every reasonable doubt, not only that the accused committed an act which resulted in the death of another human being, but it must be proven that before the commission of the act which results in death that the accused had formed in his mind a distinct and definite purpose to take the life of another human being and deliberated or meditated upon such purpose for a sufficient length of time to be conscious of a well defined purpose and intention to kill another human being and if then in the execution of such purpose and design he kills another, his act is murder in the first degree. It is not necessary that such purpose and intent to kill another human being shall exist for any particular length of time; it is sufficient if between the formation of the purpose or intent to kill and the act of killing there elapses enough time that the slayer is fully conscious of a deliberate purpose and intent to kill another human being,

if then in pursuance of that purpose and intent he kills another human being, he is guilty of murder in the first degree. See Douglas v. State, 152 Fla. 63, 10 So. (2nd) 731; Madison v. State, 138 Fla. 467, 189 So. 832; Waterman v. State, 121 Fla. 244, 163 So. 569, and many other cases.

The established rule as to premeditated design *supra* has been applied by this Court to the adduced facts in many cases. We have held that the facts adduced by the State in the following cases, among many others, were insufficient and failed to establish premeditated design or intent to kill. See Richardson v. State, 80 Fla. 634; 86 So. 619; Smithie v. State, 84 Fla. 498, 94 So. 156; Forehand v. State, 126 Fla. 464, 171 So. 241; Frank v. State, 121 Fla. 53, 163 So. 223; Stephens v. State, 140 Fla. 825, 192 So. 402; Douglas v. State, *supra.*

Section 924.34, Fla. Stats. 1941, confers upon the Supreme Court of Florida the power to reverse on appeal the judgment of the trial court, with directions to enter judgment for such lesser degree of offense (which can or may be included under the indictment of which the appellant stands convicted), which the adduced testimony will sustain or justify. See Douglas v. State, *supra.* My conclusion, after a careful study of all the testimony, is that the evidence adduced is legally insufficient to sustain the verdict and judgment for murder in the first degree in the case at bar, but that it is legally sufficient to sustain a sentence and judgment for the crime of manslaughter.