108 So.2d 755 (1959)
E.C. DANIELS, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
February 4, 1959.
*756 Ferguson & J. Popling, Lake City, for appellant.
Richard W. Ervin, Atty. Gen., and Odis M. Henderson, Asst. Atty. Gen., for appellee.
O'CONNELL, Justice.
E.C. Daniels was tried on an indictment for the premeditated murder of Clara Mae Ward. The jury returned a verdict of guilty of murder in the first degree. By vote of six to six the jury declined to make a recommendation of mercy. Defendant's *757 motion for new trial was denied by the court and he thereupon appealed.
Defendant does not contend he was guiltless or that the killing was necessary, justifiable or excusable. His principal argument is that the evidence was insufficient to show a premeditated design to effect the death of Clara Mae Ward. He also contends that the court erred in refusing to give to the jury a certain charge requested by the defendant.
Defendant and the deceased, Clara Mae Ward, Negroes, had been going together for several months. On the night of the homicide the parties were on a date. Between 10:00 P.M. of March 1 and 1:00 A.M. of March 2, 1957, they visited several eating and drinking establishments in Lake City, Florida. At one place they consumed about two quarts of beer. They progressed to another place where they obtained fish sandwiches, took them with them in defendant's pick-up truck, parked, consumed about a half pint of whiskey and ate the sandwiches. They then went to another place, known as "Wilson's Place", where they purchased a quart of beer, but only drank about half of it. About 1:00 A.M. they left Wilson's Place in defendant's truck.
Defendant and the victim were the only eye witnesses to the fight which resulted in the homicide here involved. One witness, however, testified that he heard the fight.
Defendant testified at the trial. He stated that when he and the victim left Wilson's Place they were both intoxicated. They got in his truck and drove out the road toward his farm. She appeared drowsy but suddenly, when they were a short distance out of Lake City, roused and wanted to fight. Defendant continued driving until she slapped him across the eyes. He stopped the truck and the fight ensued around the truck, during which she tore his shirt and bit his thumb. Defendant then picked up a jack handle out of the back of the truck and swung it at her thighs to keep her away from him. He struck her with it several times, "low down". Finally, he shoved her away from him. As she fell, her head struck the truck. After falling she did not move; she was breathing but was limp.
Defendant stated he then tried to put her in the cab of the truck, but could not. He put her in the rear of the truck and decided to ride her around a bit, thinking the air would revive her. He stopped once or twice and attempted to revive her but then discovered she had ceased breathing. He then became panicky, fearing what both her family and the authorities might think. He drove further out into the country to the spot where her body was subsequently found. Once again he attempted to revive her and failing to do so drove off, leaving her behind
The body of the victim was not discovered for some 12 days. In the interim the defendant had been taken into custody on suspicion and confined to the County Jail.
When the body was discovered, the defendant notified the Sheriff of the County that he wished to tell what had happened. At the trial the oral admissions made by the defendant to the Sheriff, in the presence of a deputy sheriff, were admitted in evidence without objection. Omitting the preliminaries, the Sheriff related that defendant told him that as they drove out of Lake City defendant
"* * * Noticed Clara Mae had something in her hand, and he turned off in the dirt road and he grabbed the jack handle and went to beating her and when he realized what he was doing, she was down, and he examined her and he didn't think she was alive, then he picked her up and put her in the back of the truck. * * *"
The Sheriff further testified that the defendant had stated that he had had a drink or two and lost his head, that he did not intend to kill the victim.
*758 Charlie Whitfield, an ear witness to the incident, testified that he lived near the country road on which the fight here involved occurred, his house being about 100 feet from the road; that he was awakened the night of the killing, sometime between midnight and day, by a woman's screams; and that he went out on his porch and recognized defendant's truck stopped on the road in front of his house. Whitfield stated he did not see the fight but heard a woman yell "he's going to kill me" and heard several blows being struck; that the woman continued to "holler for help" for some fifteen or twenty minutes; and that the licks continued "a time or two" after the yelling stopped, whereupon the truck drove off and he returned to bed. He also testified that several hours later he saw the defendant return to the same scene in front of his house in his truck, stop and pick up a hat.
Another witness, James Davis, testified that he walked down the road past Charlie Whitfield's house between 8 and 9 A.M. of the morning following the fight and that he saw
"* * * blood in the road and the jack handle with blood on it, * * * and seen where someone was drugged [dragged] across the road. * * *"
On cross-examination this witness testified that the "drag mark" extended across the road, from one ditch to the other. The jack handle was introduced in evidence as was a lipstick, later found at the scene, and identified as belonging to the victim.
As above stated the victim's body was not discovered until some 12 days after the fight. The body had suffered disfigurations of the fleshy parts. The State concedes that at least some of these disfigurations were caused by birds and beasts of the field. Nevertheless, the State contends that certain of the wounds and fractures found in and on the body were inflicted by the bludgeoning attack of the defendant.
As described by the medical doctor who performed an autopsy on the body, the lacerations, wounds and fractures were:
"* * * there was a laceration, a cut, a half inch long behind where the ear had been located on the left, [the left ear was missing] there was a bruise of the neck, slightly to the left near where the skull fastens to the neck, there was a two-inch cut on the left scalp, above where the left ear would have been located, and slightly forward there was a three-inch cut."
"* * * there was a one-inch cut at the back of the skull, there was contusion of the right jaw, laceration of the right jaw, laceration of the left cheek, eye, the finger bones of the left hand, the second one to the index finger, the fourth and fifth one were broken, or fractured, there were bruises and contusions, abrasions and contusions of the backs of both hands, across the knuckles, there were abrasions of the right thigh, there was a two inch long laceration of the left foot, the inner arch area, the fleshy parts of the left thigh were mainly absent, there being some contusions, there was a chipped fracture of the left shin bone, the tibea to the outer side, with a laceration of the calf of the left leg in that same region * * * there was a fracture of the first and second neck bones, the first and second cervical vertebrae with compression of the spinal cord at that area. * * *"
The doctor testified that the cause of death was "a high fracture of the neck with compression of the cord", i.e. a broken neck. He stated that the broken neck would cause immediate death.
The State surmises that defendant first rendered his victim helpless by beating her and then when she tried to flee struck the fatal blow or blows at the base of her skull.
Defendant admits, for the sake of argument, that he may have used more force *759 than was reasonably necessary to fight off the attacks of his victim, but even so he says all of the State's evidence, when considered with his undisputed version of the events, does not exclude the hypothesis that the victim was killed in a sudden drunken fight, without premeditation. He argues that the jury apparently ignored his version of the killing, but they should not have done so since there was no other evidence legally sufficient to contradict it. Mayo v. State, Fla. 1954, 71 So.2d 899; Jenkins v. State, 1935, 120 Fla. 26, 161 So. 840.
Defendant concedes that intent may be established by circumstantial evidence, but says that in this case the evidence is not sufficient.
He argues that his prior good relationship with the deceased, their intoxication, lack of motive and his good character as testified to at the trial, all refute the existence of premeditation.
Defendant cites in support of his position three cases in which he says this Court prevented the defendants from paying the supreme penalty because of lack of proof of premeditation. Douglas v. State, 1942, 152 Fla. 63, 10 So.2d 731; Jenkins v. State, supra, and Taylor v. State, 1945, 156 Fla. 122, 22 So.2d 639.
We have carefully reviewed each of those cases, as well as others not cited by the defendant. We find that in all those cases the factual circumstances were not as strong in supporting a conclusion by the jury of premeditation as in the case now before us.
The element of premeditation, as well as all elements of the crime of murder, must of course be proven by the State. The accused's guilt must be established beyond a reasonable doubt. The ultimate question of whether there was premeditation is to be determined by the jury. Smith v. State, Fla. 1956, 90 So.2d 304; Snipes v. State, 1944, 154 Fla. 262, 17 So.2d 93. In the latter case, at page 97 of 17 So.2d, this Court said:
"* * * An essential element of murder in the first degree is premeditated design and in order to constitute murder in the first degree it must be established beyond every reasonable doubt, not only that the accused committed an act which resulted in the death of another human being, but it must be proven that before the commission of the act which results in death that the accused had formed in his mind a distinct and definite purpose to take the life of another human being and deliberated or meditated upon such purpose for a sufficient length of time to be conscious of a well defined purpose and intention to kill another human being, and if then in the execution of such purpose and design he kills another, his act is murder in the first degree. It is not necessary that such purpose and intention to kill another human being shall exist for any particular length of time; it is sufficient if between the formation of the purpose or intent to kill and the act of killing there elapses enough time that the slayer is fully conscious of a deliberate purpose and intent to kill another human being * * *." [Emphasis added.]
The State concedes that there was no evidence of premeditation until the defendant stopped his truck at the scene of the fight.
No motive for the killing was shown. Where proof of the crime is circumstantial motive may become both important and potential. Bonner v. State, 1914, 67 Fla. 492, 65 So. 663; Coco v. State, Fla. 1955, 80 So.2d 346, 349. But lack of motive does not prevent proof of premeditated homicide. It only renders the State's burden more difficult.
Defendant's contention that his version of the incident was the only legally sufficient *760 evidence before the jury is not supported by the record. There was other evidence which the jury could consider.
First, there was the testimony of Charles Whitfield to the effect that the fight lasted some 15 to 20 minutes during which the victim screamed several times "he is going to kill me", and that he heard licks "a time or two" after the screaming stopped. This evidence is contradictory of defendant's contention that he was merely trying to ward off the victim. A fight which lasts 15 to 20 minutes is not a sudden drunken fight.
Second, the jury had the right to consider the evidence given by James Davis of the "drag marks" showing that someone had been dragged from one ditch across the road to the other ditch, which indicates that the victim had collapsed, not against the truck as claimed by defendant but in, or near, the ditch on one side of the road.
Third, there was no evidence that the victim was armed with any weapon or object of any kind. She weighed approximately 140 pounds and the defendant about 186 pounds. Yet defendant had armed himself with a jack handle, an object sufficiently lethal, as used by defendant, to kill.
From the evidence given by the State's medical witness, the jury had the right to believe that the defendant had used the jack handle, not merely to keep the victim from him, but rather to make a vicious attack on her, breaking her neck, fracturing several fingers, chipping her shin bone and making various cuts and lacerations about her head and body.
Fourth, they had the right to consider the actions of defendant in hiding the body of the victim.
As this Court said in Blackwell v. State, 1920, 79 Fla. 709, 86 So. 224, at page 226, 15 A.L.R. 465:
"* * * The rule is that, when a suspected person in any manner endeavors to escape, or escape, or evade a threatened prosecution, by flight, concealment, resistance to a lawful arrest, or other ex post facto indication of a desire to evade prosecution, such fact may be shown in evidence as one of a series of circumstances from which guilt may be inferred. Whart.Crim.Ev. (9th ed.) § 750, and citations; Carr v. State, 45 Fla. 11, text 16, 34 So. 892."
See Gray v. State, 1900, 42 Fla. 174, 28 So. 53, wherein this Court said evidence of flight by an accused was competent. Also Freeman v. State, Fla.App. 1958, 101 So.2d 887.
It is evident from the above cases that evidence of flight or concealment of a crime raises no presumption of guilt. It is, nevertheless, a circumstance which the jury may rightfully consider, together with all other circumstances, and in light of such circumstances may give thereto such weight as it, the jury, shall determine.
For the foregoing reasons, we conclude that there was competent evidence in the record upon which the jury could and did rightfully find that the homicide committed by the defendant was premeditated.
We have considered the contention of the defendant that he was intoxicated to the extent that he would be incapable of forming the intent to kill, but the record does not support this contention.
The only other point raised by defendant is that the trial judge erred in failing to give the jury the following charge requested by defendant:
"You are instructed that the actions of the defendant in respect to the disposition of the body of the deceased after her death have no bearing upon the element of premeditated design to effect the death of the deceased as *761 stated in the definition of first degree murder." [Emphasis added.]
Here on appeal, however, the defendant argues that the court erred "in refusing to instruct the jury that evidence of concealment of the body of deceased does not necessarily constitute proof of premeditated design to effect the death of such deceased."
There is considerable difference between the requested charge and the quoted portion of the last paragraph.
The Blackwell case, above cited, is sufficient authority to hold that the requested charge was properly refused by the trial court.
We have examined and considered the record in the light of the briefs filed and have also, pursuant to subparagraph (2) of Sec. 924.32, Fla.St., F.S.A., reviewed the evidence to determine if the interest of justice requires a new trial, with the result that we find no reversible error is made to appear and that the evidence does not reveal that the ends of justice require a new trial to be awarded.
We have not overlooked the fact that six members of the trial jury voted for a recommendation of mercy. It might well be that the Pardon Board upon application to it will commute the sentence from death to life imprisonment, but we are without authority to do so.
Accordingly the judgment and sentence appealed from is
Affirmed.
TERRELL, C.J., and ROBERTS and DREW, JJ., concur.
THORNAL, J., dissents.
THORNAL, Justice (dissenting).
Having carefully examined the record pursuant to the requirements of F.S. Sec. 924.32, F.S.A. and being of the view that the vital essential of premeditated design was not established beyond a reasonable doubt, I would reverse the judgment with directions to enter a judgment of guilt of murder in the second degree, and sentence accordingly, as authorized by Sec. 924.34, Fla. Stat., F.S.A.