783 So.2d 1171 (2001)
Jack Martin SEWALL, Appellant,
v.
STATE of Florida, Appellee.
No. 5D00-720.
District Court of Appeal of Florida, Fifth District.
April 20, 2001.
*1173 James B. Gibson, Public Defender, and Barbara C. Davis, Assistant Public Defender, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Lori E. Nelson, Assistant Attorney General, Daytona Beach, for Appellee.
PETERSON, J.
Appellant, Jack Sewall, appeals the denial of his motion for judgment of acquittal on charges of grand theft[1] (count I) and organized fraud[2] (count II). Sewall also appeals the imposition of an upward departure sentence.

I. Facts
Sewall, an insurance salesman operating through his corporation, JMS Insurance Corp., promoted his business by conducting seminars, participating in weekly radio programs, and also appearing on a local television talk show where he discussed health care, insurance, and other issues related to the needs of elderly persons. It was to these elderly persons that he primarily marketed long-term care and supplemental health policies.
Beginning in 1991 and continuing until financial failure in August 1996, Sewall solicited some of his elderly insurance customers to invest in his insurance business. Investments were solicited in amounts ranging from $1,000 to over $250,000 per investor, with the average investment being around $25,000. These investments were to be repaid in seven months to two *1174 years with 15% to 30% interest. Sewall explained to the investors that he needed the funds for expansion of his business and to open new offices in other nearby cities. He told many of the potential investors that another investor had died and that he needed just one more investor for this great opportunity. Most of the time, Sewall told potential investors that there were only four to eight investors in his investment program. Many of the investors were also told that Sewall personally guaranteed the investment in the event that he or his corporation had to file bankruptcy and that he had life insurance to cover their investment.[3] Some of the investors were given a written agreement which included these promises. The agreement also stated that the funds would be used for corporate purposes, although Sewall asked that some checks be made payable to him personally.
Sewall also promoted concerts and variety shows between December 1994 and April 1996. He utilized his insurance agents and some of the investors to assist him with seating, ticket sales,[4] and setting up for the shows. Sewall paid nothing for these services and the total cost for the auditorium rental during the two year period was $3,027. In order to fund these shows, Sewall again solicited his insurance clients and acquaintances for his entertainment business, JMS Productions, and as before promised high interest rates of between 18% and 65%. Investors would make checks payable to JMS Insurance, JMS Productions, or to Sewall personally as he requested. The same promises and inducements were made to these investors as were made to the investors in the insurance expansion including the personal guarantees, life insurance guarantees, and bankruptcy guarantees. In fact, Sewall used the JMS Insurance investment agreement for the production company investors.
In 1994, Sewall began having financial and family problems and he separated from his wife, Charlene Ricci Sewall (Ricci). Prior to the separation, Ricci had assisted Sewall at JMS Insurance on a casual basis and was paid an hourly rate. After the separation, Ricci ceased working for JMS Insurance, yet numerous checks totaling approximately $20,000 made payable to Ricci were deposited into Ricci and Sewall's joint bank account with the notation that they were for Ricci's pay.
Also, in 1995 and 1996, numerous checks were written from the corporate business account for personal items and tuition for the Sewall children. Additionally, over $100,000 in checks payable to Sewall or to cash were drawn on the JMS Insurance account. Evidence was also introduced that bar tabs were paid with company checks and that company checks had been cashed at an off-track wagering establishment. Two persons testified that Sewall had used company funds to sponsor them in golf tournaments and on golf tours.
During this same time period, investors' interest checks were being dishonored. Investors became concerned and began demanding not only their delinquent interest payments, but their original investment as well. Some of the investors, who did receive part of their original investment, were paid with checks from other investors. Sewall made various excuses for dishonored checks, to wit: he had closed his bank account, Ricci had taken money out *1175 of the JMS Insurance account, and Ricci had frozen his bank accounts in the divorce proceedings. The evidence showed that Ricci's signature was not authorized on the JMS Insurance account, she had not frozen any accounts during their bitter divorce, and Sewall had not closed his account. Despite his financial difficulties, Sewall continued soliciting potential investors for both the insurance company expansion and the promotions of the shows until August 1996 when he failed financially.
Forty-two investors testified during the trial. The youngest reported age of the investors was 65 years old with the oldest being 88 years old. Most of the investors testified that they would not have made the investments if Sewall had not offered the personal as well as the life insurance guarantees. They had entered the contracts because they thought they were good risk free investments and because they trusted Sewall. This trust was due in large part to Sewall's position as their insurance agent and for others it was because Sewall was like a family member to them. Between January 1995 and December 1996, the period of time charged in the information, Sewall received $561,827.50 from the victims.[5] Between 1991 and 1996, the amount was over $1,000,000. Sewall only paid approximately $117,000 during the five year period to the investors in principal and interest payments.
The jury returned guilty verdicts on counts I and II, as charged in the information and Sewall was sentenced only on the grand theft charge pursuant to Donovan v. State, 572 So.2d 522 (Fla. 5th DCA 1990).
During the sentencing hearing the State offered the testimony of three investors. One witness indicated that his wife had to return to work and he had to relinquish supplemental insurance as a result of losing his money. Another witness stated that she had to return to work, her 72 year old husband had to return to work full-time, and she had to obtain a home equity loan as a result of losing her life savings. One investor who lost over $250,000 to Sewall, indicated that he knew of many other investors who had suffered hardships as a result of losing their investments but these investors were just too embarrassed to testify. He spoke of one couple who needed their money for nursing home expenses because they had no insurance after believing that a policy had been secured from Sewall.[6] One investor's husband committed suicide, one investor was unable to pay for her granddaughter's nursing tuition, and another was unable to pay money for cancer treatment for her son who died during the pendency of this case.
Because the potential sentence was so light, the State asked for a departure sentence, citing sections 921.0016(1)(j) and (n), Florida Statutes (1995). The trial court entered a departure sentence of ten years in the Department of Corrections, followed by ten years probation with credit for eighteen months time served on community control for his previous crime of writing bad checks.

*1176 II. Grand Theft
Sewall contends that the trial court erred in denying his motion for judgment of acquittal on the charge of grand theft because the State did not prove that he had the intent to defraud the investors. A motion for a judgment of acquittal cannot be granted unless there is no legally sufficient evidence upon which the jury may base a verdict. See Brewer v. State, 413 So.2d 1217, 1220 n. 1 (Fla. 5th DCA 1982). When a defendant moves for a judgment of acquittal, he admits all facts stated in the motion, all evidence adduced at trial, and every conclusion favorable to an adverse party that a jury might reasonably infer from the evidence. See Fletcher v. State, 472 So.2d 537, 539 n. 2 (Fla. 5th DCA 1985) (citing Lynch v. State, 293 So.2d 44 (Fla.1974)). If there is room for a difference of opinion between reasonable people as to the proof or facts from which an ultimate fact is to be established, or where there is room for such differences on the inferences to be drawn from the conceded facts, the court should submit the case to the jury. See Taylor v. State, 583 So.2d 323, 328 (Fla.1991).
Section 812.014(1), Florida Statutes (1995) states:
A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:
(a) Deprive the other person of a right to the property or a benefit therefrom.
(b) Appropriate the property to his or her own use or to the use of any person not entitled thereto.
Felonious intent is an essential element of the crime of grand theft. See Iglesias v. State, 676 So.2d 75, 76 (Fla. 3d DCA 1996) (citations omitted). In order to sustain a conviction for grand theft, the State must show that the defendant had the specific intent to commit the theft at the time of or prior to the commission of the act of taking. See id. (citing Rosen v. Marlin, 486 So.2d 623 (Fla. 3d DCA 1986)). Because intent to commit the theft usually cannot be proven by direct evidence, the intent may be inferred from the circumstances surrounding the illegal act. See id. (citing Coester v. State, 573 So.2d 391 (Fla. 4th DCA 1991)). However, the circumstantial evidence must exclude every reasonable hypothesis but that of guilt. See Szilagyi v. State, 564 So.2d 644, 646 (Fla. 4th DCA 1990) (citing Gitman v. State, 482 So.2d 367 (Fla. 4th DCA 1985)). Notwithstanding, a trial court should rarely, if ever, grant a motion for judgment of acquittal based on the State's failure to prove mental intent. See Brewer v. State, 413 So.2d 1217, 1220 (Fla. 5th DCA 1982). A directed verdict cannot be given if the testimony is conflicting, or lends to different reasonable inferences, tending to prove the issues. See King v. State, 545 So.2d 375, 378 (Fla. 4th DCA 1989) (citing Snipes v. State, 154 Fla. 262, 17 So.2d 93 (1944)).
At trial, the State presented witnesses to show that at the time Sewall accepted funds from investors he made material misrepresentations of fact which were designed to induce them to give him funds. The representations included: 1) Sewall's statements to several investors that there were only limited investment opportunities because an investor had died or needed to sell his shares, when in fact he had numerous investors; 2) Sewall would pay 15% to 65% interest when he knew he could not pay it; 3) Sewall claimed the money would be used for the production or insurance business when he in fact used the money for his personal use; 4) Sewall told investors he was expanding into Ocala and other locations when he never intended on expanding the business into Ocala; 5) Sewall knew the *1177 business was failing but he continued to solicit; 6) Sewall told several investors that he had a million dollar life insurance policy which would cover their investment, when he owned only two life insurance policies totaling $147,000 both of which named his wife as beneficiary; and 7) Sewall told investors that business was great and the productions were going well, when in reality he had insufficient funds to cover checks that he was issuing. Evidence also showed that during the period of time charged in the information, Sewall took over $500,000 from the investors and only returned a nominal amount. Sewall promised investors that the monies would be used for expansion and productions, but it was used for his children's tuition, his personal grooming and care, and alimony for his ex-wife. Sewall told one investor that he needed money to buy out Ricci's share of the business. The investor gave Sewall the money fearing he would lose his investment if Ricci forced the business to close. Ricci, however, did not own any shares in either JMS Insurance or JMS Productions. We conclude that competent and substantial evidence was presented to support the jury's determination that Sewall knowingly obtained money with the intent to deprive the investors of any benefit therefrom, and that he used the investors' money for his own use when he was not entitled to do so. Therefore, the trial court's denial of Sewall's motion for judgment of acquittal as to the charge of grand theft was proper.

III. Organized Fraud
Sewall also contends that the court erred in denying his motion for judgment of acquittal on the charge of organized fraud. Section 817.034(4)(a), Florida Statutes (1995), provides that, "Any person who engages in a scheme to defraud and obtains property thereby is guilty of organized fraud ..." Section 817.034(3)(d) defines a "scheme to defraud" as "a systematic, ongoing course of conduct with intent to defraud one or more persons, or with intent to obtain property from one or more persons by false or fraudulent pretenses, representations, or promises or willful misrepresentations of a future act." The elements of theft are included in the elements of organized fraud. See Donovan, 572 So.2d at 526. However, organized fraud contains one additional elementengaging in or furthering a systematic, ongoing course of conduct. See id. Because sufficient evidence was presented to convict Sewall of grand theft, our review is limited here to determine whether the record contains evidence that Sewall was involved in an ongoing scheme or course of conduct designed to take funds from the investors.
During the trial, the State introduced evidence that Sewall had been soliciting funds from his insurance clients since 1991 telling them that the funds were needed for the expansion and opening of an Ocala office. Insurance agents who worked for Sewall testified that in 1990 and 1991, Sewall talked about opening an office in Ocala, but after that time, the idea of another office was barely mentioned. In 1996, Sewall was still telling investors that he was opening an office in Ocala and was in need of funds to further this expansion despite the fact that he was in severe financial difficulty. The State also submitted evidence that many of the same promises and inducements were made continuously from 1991 to 1996 without any meaningful action by Sewall to expand. The record adequately demonstrates that the trial court properly denied Sewall's motion for judgment of acquittal and that there was competent and substantial evidence to support the jury's verdict that Sewall engaged in ongoing conduct designed to obtain possession of the investors' funds for his own use by false promises or misrepresentations.

*1178 IV. Departure Sentence
Sewall alleges that the court erred when it departed from the guidelines. The trial court gave the following reasons for its departure: (1) the victim[s] were especially vulnerable due to age or physical or mental disability, (2) the offense resulted in substantial economic hardship to [the] victim[s] and consisted of an illegal act committed by means of fraud, (3) the offense involved multiple victims or multiple incidents per victim, (4) the offense involved a high degree of sophistication or planing or occurred over a lengthy period of time, and (5) the defendant used position or status to facilitate the commission of the offense.
Vulnerability due to age is a proper reason to justify departure. See Fla. Stat. § 921.0016(1)(j). The supreme court in Capers v. State, 678 So.2d 330, 332-33 (Fla.1996) discussing whether age alone was sufficient to justify an upward departure, declared:
As the district court correctly noted, the statute expressly prohibits departure based on the victim's law enforcement status where that status is an inherent component of the crime. See § 921.0016(3)(h), Fla. Stat. (1993). Section 921.0016(3)(j) was enacted at the same time as section 921.0016(3)(h), but does not contain a similar provision prohibiting "double counting." If the legislature had intended to prohibit departure based on vulnerability due to age where it is an inherent component of the crime, it could have expressly stated this as it did in section 921.0016(3)(h). See Thayer v. State, 335 So.2d 815, 817 (Fla.1976) ("It is, of course, a general principle of statutory construction that the mention of one thing implies the exclusion of another; expressio unius est exclusio alterius."). This conclusion is also supported by our decision in Amendments to Florida Rules of Criminal Procedure re Sentencing Guidelines, which provides that "[t]he new guidelines reflect a different structure and a shift in public policy, and, therefore, existing case law that is in conflict with the new statutes and rules of procedure will be superseded." 628 So.2d [1084] at 1084 [(Fla.1993)]; see also Fla. R.Crim. P. 3.702(b) (emphasis added).
Id. It is clear from Capers that age, by itself, is a proper factor justifying an upward departure from the sentencing guidelines.
Prior to the decision in Capers, age alone was insufficient to justify a departure sentence without some additional element to justify the departure, such as, the defendant stood in a position of trust. See Byrd v. State, 516 So.2d 107, 108 (Fla. 4th DCA 1987); see also Wemett v. State, 567 So.2d 882, 886-87 (Fla.1990). But even if pre-Capers case law was still applicable, the victims' ages coupled with the fact that Sewall, their insurance agent who stood in a fiduciary relationship with them, would be sufficient to justify the departure. See Manuel v. State, 542 So.2d 1368, 1369 (Fla. 2d DCA 1989); see generally Randolph v. Mitchell, 677 So.2d 976 (Fla. 5th DCA 1996); Beardmore v. Abbott, 218 So.2d 807 (Fla. 3d DCA 1969) (insurance brokers stand in a fiduciary relationship with their insureds).
Sewall urges that no substantial evidence exists to show that the crime resulted in a substantial hardship to any of the victims. Sewall further claims that because his crime was one of grand theft, his victims economic loss was an inherent factor in the crime precluding a departure sentence based upon economic hardship citing Rubin v. State, 697 So.2d 161, 163 (Fla. 3d DCA 1997), reversed on other grounds, State v. Rubin, 721 So.2d 716 (Fla.1998). Since economic loss is an inherent *1179 component of every theft, the amount of loss itself cannot alone justify a departure sentence. See Rubin, 697 So.2d at 163. However, where there is a preponderance of proof that the victim sustained a substantial economic hardship, a court can properly enter a departure sentence. See id. Moreover, section 921.0016(1)(n), Florida Statutes, states:
(n) The offense resulted in substantial economic hardship to a victim and consisted of an illegal act or acts committed by means of concealment, guile, or fraud to obtain money or property, to avoid payment or loss of money or property, or to obtain business or professional advantage, when two or more of the following circumstances were present:
1. The offense involved multiple victims or multiple incidents per victim;
2. The offense involved a high degree of sophistication or planning or occurred over a lengthy period of time;
3. The defendant used position or status to facilitate the commission of the offense, including positions of trust, confidence, or fiduciary relationship; or
4. The defendant was in the past involved in other conduct similar to that involved in the current offense.
In the instant case, the evidence indicated that several investors had suffered severe economic hardship as a result of Sewall's crime. One 69 year old investor had to return to work, her 72 year old husband had to find full time employment, and they had to obtain a home equity loan on their home as a result of Sewall's crime. Another testified that his wife was forced to return to work and he had to relinquish supplemental insurance. The evidence clearly showed that Sewall defrauded forty-two victims, that he stood in a position of trust with his clients, and both the offense of theft and organized fraud occurred over a long period of timefive years. Thus, three of the four additional factors were present and in order for a departure based on economic hardship to be valid, only two of the enumerated factors must be present. See Fla. Stat. § 921.0016(1)(n). The trial court did not err when it sentenced Sewall to a departure sentence.
The conviction and departure sentence is affirmed.
AFFIRMED.
SHARP, W. and PLEUS, JJ., concur.
NOTES
[1] Fla. Stat. § 812.014(1) (1995).
[2] Fla. Stat. § 817.034(4) (1995).
[3] Sewall falsely told several investors that he had a one million dollar life insurance policy which would cover their investments in the event of his demise.
[4] Sewall failed to collect sales taxes on ticket sales or pay the taxes to the Florida Department of Revenue.
[5] The State used this time period in the information even though Sewall began soliciting money as early as 1991. The earlier time periods, as well as the bounced checks, showed the ongoing business and scheme to defraud the investors.
[6] Although it was proven in a companion case that Sewall was paid insurance premiums, but failed to pay the insurance company, evidence of this crime was restricted in this case. Indeed, Sewall's taking of insurance premiums was only mentioned once and the defense only requested a curative instruction which was given by the court.