952 So.2d 1216 (2007)
James Kirk ISENHOUR, Appellant,
v.
STATE of Florida, Appellee.
No. 5D06-888.
District Court of Appeal of Florida, Fifth District.
March 30, 2007.
*1217 Gregory E. Tucci, Ocala, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Kristen L. Davenport, Assistant Attorney General, Daytona Beach, for Appellee.
SAWAYA, J.
A jury convicted James Isenhour of grand theft, and the trial court sentenced him to five years' imprisonment followed by 30 years' probation. Isenhour appeals, contending that the State failed to prove the requisite criminal intent to support the grand theft conviction. He also contends that the State failed to prove a person or entity had an interest in the funds superior to his own. We agree with both contentions and reverse.

Factual and Procedural Background
In 1978, Isenhour co-founded Ocala's Cambridge Academy, which is an accredited long-distance educational institution providing services to students who are no longer successful in public school. In the pertinent time period, Isenhour was chairman of the board of the school. Isenhour was also the chief financial officer of Silver Archer Foundation, Ltd., which Isenhour formed and had qualified as a nonprofit Scholarship Funding Organization [SFO] *1218 under the laws of Florida in January 2002.[1] Institutions qualifying as SFO's receive corporate donations and must, by statute, funnel 100% of the corporate donations to qualifying children in the form of scholarshipsnone of the donated money can be used for administrative expenses. In return for their participation in the scholarship program, the corporations receive a dollar-for-dollar credit on their Florida corporate income tax liability as long as all qualifying factors of section 220.187, Florida Statutes (2003) (entitled, "Credits for Contributions to Nonprofit Scholarship-Funding Organizations") are met and the SFO certifies that the money was paid out as scholarships to qualifying students.
In early 2003, Isenhour learned that Pulte Homes, Inc., a residential construction corporation, was intending to participate in the program, so he telephoned the company and solicited funds from it. He urged early donations, and Pulte responded with donations totaling $268,125. Isenhour then attempted to get both the principal and the student services director of Cambridge Academy to identify qualifying students so that the scholarship money could be disbursed. Both testified that they had refused to do so because they believed that finding scholarship students was the job of Silver Archer, not Cambridge Academy. Isenhour tried a number of times and in a number of ways to get Cambridge Academy to cooperate, but with no success. He asked the principal to have an employee make phone calls to solicit student applications for the SFO scholarship funds, but she refused. In addition, Isenhour gave the principal checks and applications and asked her to secure qualified students, but again she refused. Isenhour, by all accounts, was angered by the lack of cooperation and greatly frustrated.
During this period of time, a harbinger of the difficulty to befall Isenhour appeared when Cambridge Academy started to experience financial difficulty. Isenhour and his ex-wife both testified to selling a private airplane and boat and using the proceeds to support the school. Isenhour also used money from other corporations he held to pay expenses at Cambridge Academy and borrowed money from at least one Cambridge Academy employee. Bankruptcy proceedings were initiated and, apparently due to IRS problems, the IRS periodically cleaned out Cambridge Academy bank accounts. Interestingly, in the same period that Isenhour was unsuccessfully attempting to award the Silver Archer scholarships, Cambridge Academy did give tuition credits to needy students in an amount that was almost the same as that donated by Pulte.
In any event, Isenhour testified that he deposited the Pulte funds into the Silver Archer account at Wachovia Bank. Isenhour admitted to using the funds to pay the bankruptcy attorney for Cambridge Academy, to repay a loan from a Cambridge Academy employee, and to pay salaries and payroll, including over $7,500 to himself as salary after not receiving any income from Cambridge Academy for some period.
Isenhour refused to certify that he had used the funds as required by statute, as he had not. He notified the Department of Education that he would not be certifying the funds. This triggered the Department of Education to advise Isenhour that the failure to provide the certification would result in Silver Archer no longer *1219 being qualified as an SFO. The Department of Education advised Isenhour that it would be informing the Department of Revenue of this fact.
Isenhour was aware that the funds were not supposed to have been used for administrative expenses and telephoned both the Department of Revenue and the Department of Education to see what should be done. Neither had helpful advice. In fact, one e-mail from the Department of Revenue to its tax law specialist relates that Isenhour had called and asked what to do with contributions that had not been given to students and the writer had advised Isenhour that "that would be up to the DOE." Another Department of Revenue e-mail shows that Isenhour had called another time and wanted an opinion as to what to do with unspent money and the Department had referred him to the statutes and suggested that Isenhour's problem was with the Department of Education as "there were no provisions in the statute to return money to the corporations or how to handle any extra money that was not spent on scholarships by the end of the state fiscal year. . . . [Isenhour] was not happy with my answers and seemed frustrated." A third e-mail relates another call from Isenhour and memorializes that the Department of Revenue author had advised Isenhour "that the best course of action may be to return unspent funds to the contributors since if he didn't send the required receipt we may disallow all or a portion of the credit for the contributors and that may get him in trouble with the contributors also. I explained several times that we were only obligated to the taxpayer and that we had been meeting with other agencies to determine who was responsible for the SFO's."
It seems that Silver Archer's situation (the inability to find scholarship-eligible students to give the money to) was a first, as the program was apparently a new one, and there was no statutory provision giving guidance. Isenhour telephoned Pulte seeking to return the money to Pulte; Pulte refused to engage in any discussion with him because it was aware that an investigation into the funds had been launched. An investigator with the Florida Department of Revenue audited Silver Archer's books and concluded that Silver Archer funds were used for the operational purposes of Cambridge Academy and not a single dollar had gone for scholarships. A criminal Information was filed against Isenhour charging that between March 1 and August 15, 2003, Isenhour
did unlawfully and knowingly obtain, use or endeavor to obtain or use the property of DEPT OF REVENUE, to-wit: U.S. Currency, of the value of one hundred thousand dollars ($100,000.00) or more, with the intent to either temporarily or permanently deprive DEPT OF REVENUE of a right to the property or a benefit thereof, or did appropriate the said property to his own use or to the use of any person not entitled thereto, in violation of Florida Statutes 812.014(1) and 812.014(2)(a);. . . .
At trial, even the prosecutor admitted that there was no provision in the statutory scheme for giving the money back to either the corporate donor or to the Department of Revenue if scholarship students were not located and the money was not given out. The prosecutor stated, too, that the reason Isenhour's inquiries to the State as to how to return the money were not answered is that the State "hadn't anticipated this far down the line."
Isenhour's attorney moved several times for a directed verdict on the basis that the Information charged that the criminal act occurred between March and August 2003 and, during that period, the money was rightfully in Silver Archer's possession and *1220 the Department of Revenue, the alleged victim, had no right to the money. Even assuming the Department of Revenue could have been the victim, it could not have become the victim until it was deprived of the funds, which would have occurred when Pulte's tax was due, which was after the time frame alleged. There was no evidence that the Department of Revenue was owed, or had any interest in, the funds during the period alleged, nor was there evidence that the State owned the money when Pulte made the donation to Silver Archer, the attorney pointed out.
The prosecutor responded that "of course" the money was the Department of Revenue's money. He reasoned that the money was sales tax money (it was not) and the State's interest accrued immediately upon being collected. The court then questioned how the Department of Revenue could be the victim where it had given the tax credit to Pulte anyway.[2] The prosecutor's answer was that the victims were the needy students who did not receive the scholarships, but the State could not plead unnamed victims. The court reserved ruling.
At the conclusion of the evidence, Isenhour's attorney renewed his motion. Then, after the jury returned its verdict, Isenhour's attorney moved for a judgment of acquittal notwithstanding the verdict. These motions were denied, judgment was entered against Isenhour, and he was sentenced to five years in prison. Isenhour appeals, contending that the State failed to prove the requisite criminal intent to support the grand theft conviction and that the State failed to prove a person or entity had an interest in the funds superior to his own.

Standard of Review
We must review the record de novo to determine whether there is sufficient evidence to support the verdict. Pagan v. State, 830 So.2d 792 (Fla.2002), cert. denied, 539 U.S. 919, 123 S.Ct. 2278, 156 L.Ed.2d 137 (2003); McHolder v. State, 917 So.2d 1043 (Fla. 5th DCA 2006); Sanchez v. State, 909 So.2d 981 (Fla. 5th DCA 2005); Sutton v. State, 834 So.2d 332, 334 (Fla. 5th DCA 2003). In Sutton, we explained:
This court has repeatedly held that a motion for judgment of acquittal should be denied if the state presents competent evidence to establish each element of the offense. L.C. v. State, 799 So.2d 330 (Fla. 5th DCA 2001); Espiet v. State, 797 So.2d 598 (Fla. 5th DCA 2001); V.L. v. State, 790 So.2d 1140 (Fla. 5th DCA 2001). A motion for judgment of acquittal may be granted if the evidence, viewed in a light most favorable to the state, fails to establish a prima facie case of guilt. L.C.; Espiet; V.L. In moving for a judgment of acquittal, a defendant admits not only the facts stated in the evidence, but also every reasonable conclusion favorable to the state that the trier of fact might fairly infer from the evidence. Lynch v. State, 293 So.2d 44 (Fla.1974); Espiet; A.L. v. State, 790 So.2d 1149 (Fla. 2d DCA 2001). It is the trial judge's duty to review the evidence to determine the presence or absence of competent evidence from which the trier of fact could infer guilt to the exclusion of all other reasonable inferences. A.L. "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable *1221 doubt, sufficient evidence exists to sustain a conviction." Pagan, 830 So.2d at 803 (citing Banks v. State, 732 So.2d 1065 (Fla.1999)).
Sutton, 834 So.2d at 334.
We begin our review with an analysis of the statutory provisions Isenhour was charged with violatingsections 812.014(1) and 812.014(2)(a), Florida Statutes (2003).

Legal Analysis
In determining whether the State's successful prosecution for the violation of sections 812.014(1) and 812.014(2)(a) is sustainable, we must consider "whether the evidence presented by the State was legally sufficient to establish any of the traditional common law offenses embraced within the statutory definition of theft." Nooe v. State, 892 So.2d 1135, 1139 (Fla. 5th DCA 2005) (citing Crawford v. State, 453 So.2d 1139, 1141 (Fla. 2d DCA), pet. for review denied, 459 So.2d 1041 (Fla. 1984)).
The omnibus theft statute found in section 812.014 is broad in application and includes the old offenses of misappropriation, embezzlement, and conversion, but requires that the defendant have the intent to deprive, either temporarily or permanently, "the other person of a right to the property or a benefit from the property"[3] or "[a]ppropriate the property to his or her own use or to the use of any person not entitled to the use of the property."[4] In other words, as this court observed in Brewer v. State, 413 So.2d 1217, 1219 (Fla. 5th DCA 1982), petition for review denied, 426 So.2d 25 (Fla.1983), "[U]nder the present theft statute, how the property of another is acquired is no longer important. Thus, regardless of how the property is acquired, if the defendant has the requisite intent, he is guilty of the crime of theft." (Citation omitted). See Sewall v. State, 783 So.2d 1171, 1176 (Fla. 5th DCA 2001) ("Felonious intent is an essential element of the crime of grand theft. In order to sustain a conviction for grand theft, the State must show that the defendant had the specific intent to commit the theft at the time of or prior to the commission of the act of taking. Because intent to commit the theft usually cannot be proven by direct evidence, the intent may be inferred from the circumstances surrounding the illegal act. However, the circumstantial evidence must exclude every reasonable hypothesis but that of guilt.") (citations omitted); Bartlett v. State, 765 So.2d 799, 800-01 (Fla. 1st DCA 2000) ("In order to prove specific felonious intent, the state can rely on circumstantial evidence. Since intent necessarily involves the state of mind of the perpetrator, very often circumstantial evidence is the only evidence available to prove intent. However, such circumstantial evidence must exclude every reasonable hypothesis but that of guilt."); see also McGough v. State, 302 So.2d 751, 755 (Fla.1974) ("Where an attempt is made by the State to prove [knowledge and intent] through circumstantial evidence, such proof must not only be consistent with guilt but also inconsistent with any other reasonable hypothesis of innocence.").
Adverting to the evidence in the record, the shortcomings of the State's attempt to establish that Isenhour committed the crime of grand theft are readily apparent. The evidence was unrebutted that Silver Archer was birthed to act as an SFO a year prior to the alleged offenses; that Isenhour solicited funds for the specific purpose of funding scholarships through Silver Archer; that upon obtaining the *1222 donations from Pulte, he actively and repeatedly attempted to locate qualified students and attempted to force Cambridge Academy employees to find qualified students; that Isenhour was greatly angered and frustrated by Cambridge Academy employees' refusal to identify potential scholarship students; that Isenhour refused to certify that he had used the money as required because he had not; that Isenhour contacted various state departments to find out how to handle the situation; that the departments themselves did not have solid suggestions as this was apparently a novel situation; and that Isenhour contacted Pulte to arrange paying back the money and Pulte refused to discuss it with him.
These are the facts as established by both the State's witnesses and Isenhour's own testimony. Even accepting the facts in evidence and every reasonable inference therefrom in favor of the State as must be done in reviewing a defendant's motion for judgment of acquittal, Bufford v. State, 844 So.2d 812, 813 (Fla. 5th DCA 2003), there was no evidence or inference that contradicted Isenhour's theory of the case, which was that he had no intent to steal the funds, but rather unexpectedly found himself in the position of being unable to locate qualified recipients for the scholarship money. See Benitez v. State, 852 So.2d 386 (Fla. 3d DCA 2003) (reversing grand theft conviction where State's evidence was not inconsistent with defendant's reasonable hypothesis of innocence on issue of felonious intent which was that he ran into unforeseen problems with home renovation project and never intended to deprive homeowners of their money); Everett v. State, 831 So.2d 738, 740 (Fla. 4th DCA 2002) ("[A] motion for judgment of acquittal should be granted in a circumstantial evidence case if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt."). Although Isenhour admittedly used the money to prop up Cambridge Academy while trying to find guidance from the State on how to handle the situation, concomitantly Cambridge Academy was giving out scholarships in an amount nearly equal to the donated Pulte funds. Thus, Isenhour reasoned, although he did not follow the specific funding procedures of the statute, the intent of section 220.187 was fulfilled by Cambridge Academy's grant of scholarships to students in an amount nearly equal to the donated funds. Although faulty, Isenhour's reasoning further shows his lack of intent to deprive the rightful recipients of the funds.
Taking all the evidence in a light most favorable to the State, there is no testimony from which it could be concluded that Isenhour had the requisite criminal intent to commit a theft of the funds. There was no evidence that at the time Isenhour obtained the funds from Pulte, he had the intent to either temporarily or permanently deprive Pulte, or any other entity, of its right to the money.
This, in fact, brings to light an additional problem with the State's case. Pulte had donated the money, thereby relinquishing its right thereto. The alleged victim was the Department of Revenue, which had eventually granted Pulte the tax credit (the decision to do so was obviously outside the dates alleged for the theft) and then asserted that but for Isenhour's theft of the money, the money would have gone to scholarships. Logically, then, the Department was not out anything as it occupies the same position it would have occupied had the scholarship funds been awardedit would not have received the money as corporate income tax and it would have given the tax credit to Pulte. Even the prosecutor was wrong at trial when he claimed that the actual victims *1223 were the needy children. There was no evidence that any qualifying students were denied scholarships because of Isenhour's acts. In fact, it was Isenhour's inability to find any qualifying students that was the root of the entire fiasco. Pulte was not victimized because it received the tax credit to which it would have been entitled had the donated money been used appropriately.
Even assuming that the Department was victimized by not receiving funds to which it would have been entitled had a credit not been given, the problem is that the Department had no interest in the donated funds during the dates alleged in the Information. Its interest in corporate income tax payments was not shown to arise at any time prior to the due date of those taxes. Unlike sales tax collection or employee withholding taxes, which are deemed held in trust by the collector thereof until paid to the government, Cash v. State, 628 So.2d 1100, 1101 (Fla.1993) (holding that gas retailer had agent-principal relationship with state regarding its collection of local option tax from gas purchasers; retailer was mere "conduit" of tax proceeds to state and, thus, retailer's personal use of tax proceeds supported conviction for grand theft), the State failed to show here that the Department of Revenue had any interest in corporate income taxes prior to the date the taxes were due and owing to the Department. Because the corporate taxes were not due until sometime after December 31, 2003, which is outside the time alleged in the Informationas correctly asserted by Isenhour's attorney belowthe State failed to establish that any person or entity had a superior right to the funds during the dates alleged in the Information.[5] In fact, no witness for the State testified that any person or entity had an interest in the money superior to Isenhour's at any time, let alone during the dates alleged in the Information.
This was a fatal flaw, just as occurred in Seiler v. State, 522 So.2d 113 (Fla. 5th DCA 1988), wherein this court reversed the county building inspector's conviction for grand theft where he had conducted licensing examinations and had kept the fees he received from applicants rather than turn the fees over to the county. Although the state alleged the inspector had criminally obtained the money from the county, there was no evidence the county had a greater interest in the collected fees than the inspector had (there were no statutes governing how to handle the collected fees) and, in the absence of proof of an essential element of the crime of grand theftthat the property the inspector used or obtained belonged to the countyreversal was required.

Conclusion
We conclude that the State failed to prove the requisite criminal intent to support the grand theft conviction. The State also failed to prove a person or entity had an interest in the funds superior to Isenhour. *1224 Accordingly, the trial court erred in denying Isenhour's motion for directed verdict. Isenhour's conviction is reversed.
REVERSED.
PLEUS, C.J., and MONACO, J., concur.
NOTES
[1] All witnesses agreed that Silver Archer and Cambridge Academy were entirely separate entities and were carefully kept separate, apparently due to Cambridge Academy's zealous efforts to retain its accreditation.
[2] Prior to the trial, the State had agreed to allow Pulte to take the tax credits because it had given the money in good faith.
[3] § 812.014(1)(a), Fla. Stat. (2003).
[4] § 812.014(1)(b), Fla. Stat. (2003).
[5] As Isenhour asserts on appeal, the tax credit was not a public fund and was not a fund of the Department of Revenue. See Bush v. Holmes, 886 So.2d 340, 356 (Fla. 1st DCA 2004) ("`Tax exemptions and general subsidies, however, are qualitatively different [from the payment of state funds]. Though both provide economic assistance, they do so in fundamentally different ways. A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole. An exemption, on the other hand, involves no such transfer. It assists the exempted enterprise only passively, by relieving a privately funded venture of the burden of paying taxes.'") (quoting Walz v. Tax Comm'n of City of New York, 397 U.S. 664, 690, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (Brennan, J., concurring) (footnotes and citations omitted)), approved in part, 919 So.2d 392 (Fla.2006).